JS 44  (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

PHOENIX LIFE INSURANCE COMPANY,

**(b)** County of Residence of First Listed Plaintiff   Hartford County, CT
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Steven J. Schild; Post & Schell, P.C.
Four Penn Center, 1600 John F. Kennedy Blvd., 13th Floor,
Philadelphia, Pennsylvania 19103-2808

## DEFENDANTS

SCOTT H. KORN,

County of Residence of First Listed Defendant   Montgomery County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT
- ☒ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332
Brief description of cause:
Declaratory Judgment, Fraud/Restitution

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   03/13/2017

SIGNATURE OF ATTORNEY OF RECORD   /s/ _Steven Schild_

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:   1233 Meadowbank Road, Villanova, Pennsylvania 19085

Address of Defendant:   1 American Row, Hartford CT 06102

Place of Accident, Incident or Transaction:   Montgomery County, Pennsylvania

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes☐   No☒

Does this case involve multidistrict litigation possibilities?    Yes☐   No☐

*RELATED CASE, IF ANY:*

Case Number:   N/A          Judge   N/A          Date Terminated:   N/A

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
   (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☒ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

### ARBITRATION CERTIFICATION

*(Check Appropriate Category)*

I,  Steven J. Schildt, Esq.          , counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE:  March 13, 2017          _____          79011

                              Attorney-at-Law                    Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE:  March 13, 2017          _____          79011

                              Attorney-at-Law                    Attorney I.D.#

CIV. 609 (5/2012)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Phoenix Life Insurance Company, | : | CIVIL ACTION |
| v. | : | |
| Scott H. Korn. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.　　　　( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.　　　　( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.　( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.　　　　( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court.  (See reverse side of this form for a detailed explanation of special management cases.)　　　　( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.　　(✓)

| | | |
|---|---|---|
| March 13, 2017 | _signature_ | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-587-1089 | 215-587-1444 | sschildt@postschell.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**Civil Justice Expense and Delay Reduction Plan**
**Section 1:03 - Assignment to a Management Track**

(a)        The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)        In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management. In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)        The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)        Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)        Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See §1.02 (e) Management Track Definitions of the**
**Civil Justice Expense and Delay Reduction Plan)**

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation. The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985. This term is intended to include cases that present unusual problems and require extraordinary treatment. See §0.1 of the first manual. Cases may require special or intense management by the court due to one or more of the following factors: (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition. It may include two or more related cases. Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues. See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PHOENIX LIFE INSURANCE COMPANY,   :
                                          :

            Plaintiff,           :

                                          :    C.A. No.

v.                                       :

                                          :

SCOTT H. KORN,                  :

                                          :

           Defendant.        :

                                          :

### PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Phoenix Life Insurance Company ("Phoenix"), by and through their attorneys, files this Original Complaint against Defendant Scott H. Korn ("Korn") and alleges as follows:

### I. THE PARTIES

1.      Phoenix is an insurance company organized and existing under and by virtue of the laws of the state of Connecticut, with its principal place of business in Hartford, Connecticut. Phoenix is authorized to transact business in the state of Pennsylvania.

2.      Korn is an individual residing in Montgomery County, Pennsylvania.  Upon information and belief, Korn maintains a residence at 1233 Meadowbank Road, Villanova, Pennsylvania 19085.  Korn is a citizen of the State of Pennsylvania within the meaning and intent of Title 28, United States Code, Section 1332.  Korn may be served at 1233 Meadowbank Road, Villanova, Pennsylvania 19085, or wherever else he may be found.

### II. JURISDICTION AND VENUE

3.      This suit presents a case of actual controversy within the diversity jurisdiction of this Court.  Plaintiff and Korn are citizens of different states and, as more fully set out below, the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs. Phoenix is a citizen of Connecticut, and Korn is a citizen of Pennsylvania.  In the event of a total disability

(as defined in the applicable policy), a rider to the life insurance policy at issue in this case provides a payment of annual premium benefit in the amount of $100,000 per year. Therefore, this Court has jurisdiction by virtue of Title 28, United States Code, Section 1332 (a)(1).

4.      This Court has jurisdiction over this declaratory judgment action as to the parties' respective rights with regard to the disability payment of premium benefit under the applicable life insurance policy pursuant to Federal Rules of Civil Procedure 57 and Title 28, United States Code, Sections 2201 and 2202, which grants the United States District Courts jurisdiction to declare the "rights and other legal relations of any interested party making such declaration, whether or not further relief is or could be sought."

5.      This Court has personal, general, and specific jurisdiction over Korn because he has resided and/or worked in this judicial district for at least the past 13 years. Moreover, Phoenix is authorized to conduct business in Pennsylvania and the life insurance policy at issue was issued in Pennsylvania on a Pennsylvania approved form.

6.      Venue is proper in this district because Korn resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and the property at issue, the life insurance policy (which includes the disability payment of premium of premium rider), was issued to Korn in this district. 28 U.S.C. § 1391.

## III.  FACTUAL BACKGROUND

7.      Phoenix is, and at all relevant times has been, in the business of issuing life insurance policies and is authorized to transact the business of insurance in the State of Pennsylvania.

8.      On October 15, 2001, Korn applied for a life insurance policy from Phoenix. *See* Exhibit 1, reproduction of Policy No. 11198960 ("Policy"). At the time of application, Korn was a 38 year-old male who was President and CEO of York Paper Company in Eddystone,

2

Pennsylvania. *Id.* Korn represented that he had been so employed for "12 + years." *Id.* In applying for Policy, Korn also represented that his earned income exceeded $1,500,000. The Policy was issued on December 18, 2001, with a face amount of $15,000,000. *Id.*

9.      In April of 2010, Korn submitted a claim under the Disability Payment of Specified Annual Premium Amount Rider (the "Policy Rider"), contending that he was totally disabled as of February, 2009.  In 2009, Korn was President and CEO of Bengal Converting and Paper.  Initially, Phoenix relied on the information submitted by Korn, and Korn received the disability payment of premium benefit under the Policy Rider.  Phoenix later became aware of information that contradicted Korn's disability claim, including but not limited to, information that Korn continued to work and act as President and CEO of Bengal Converting and Paper (despite claiming he could no longer do so), attended meetings, executed contracts for his businesses, continued to operate other business ventures, and had ownership in various companies, which provided income.  Additionally, Phoenix determined that Korn had failed to provide sufficient medical evidence supporting total disability as defined in the Policy Rider.  By letter dated December 4, 2015, Phoenix terminated the disability payment of premium benefit under the Policy Rider, and offered Korn an opportunity to provide additional information or documentation to support his disability claim.

10.      On December 18, 2015, Korn's then legal counsel requested documents from Phoenix and also represented that additional documentation supporting Korn's disability would be provided.  Counsel further requested that benefits be paid under the Policy Rider and that additional proof was being obtained.  The request that benefits be paid under the Policy Rider in the meantime was denied by Phoenix by letter dated February 5, 2016.  Phoenix also enclosed information requested by Korn's counsel with the February 5, 2016 letter.

11.     By letter dated September 2, 2016, a different legal counsel formally appealed Phoenix's decision to deny Korn the disability payment of premium benefit under the Policy Rider and submitted information allegedly in support of Korn's claimed disability, including a letter from a psychologist and an affidavit from Bengal Paper and Converting's general manager, Dylan O'Donnell. Mr. Korn contended that as of February 6, 2009, he had ceased all duties as President/CEO of Bengal due to depression, severe anxiety, panic attacks, and PTSD and has been unable to work in any gainful occupation since that time.

12.     On appeal, after reviewing the information provided by Korn's counsel, Phoenix identified additional information that contradicted Korn's disability claim, including but not limited to, information that Korn continued to work and act as President and CEO of Bengal entities, that he was able to perform tasks he claimed he was not able to perform, that he made business decisions, supervised employees, fired employees, and was otherwise capable of working, that he continued to operate or manage other business ventures, and that he had ownership in various companies, which provided income.  The information indicated that these activities had been ongoing for years.

13.     As part of the appeal, Phoenix requested that Plaintiff undergo an Independent Medical Examination ("IME"); however, again, conflicting information was communicated and obtained as a result of the IME with regard to Korn and his ability to work.  Phoenix's efforts at clarifying the various inconsistencies were not successful, and Korn has failed to provide various pieces of requested information.

14.     The Policy Rider at issue defines total disability as:

Incapacity of the insured as a result of bodily injury or disease to engage for remuneration or profit in any occupation for which the insured is qualified:

    a.  by training;

  b. by education; or

  c. by experience.

The Policy Rider further provides:

> Nor will any specified frequency premium amounts be credited or paid under this rider unless the following conditions are satisfied:

> 1. We must receive at our Main Administrative Office and during the lifetime of the insured written notice of claim and due proof that:

>> a. the insured is totally disabled at the time proof is furnished to us; and

>> b. the insured has been so totally disabled for the entire 6-month period immediately preceding that date.

> Any such proof will be subject to the requirements stated in the Required Proof of Disability section.

The Required Proof of Disability and its Continuance section of the Policy Rider states:

> In addition to requiring proof of total disability before granting any benefits under this rider, we have the right to require proof from time to time that the total disability continues. As part of any such proof, we shall have the right to have a physician of our choosing conduct such physical exams of the insured as we may reasonably require. After benefits under this rider have been received for a period of disability of more than 2 years, we will not require such exams more frequently than once a year.

> Should there be a failure to furnish such proof or a refusal to permit such exams, or should the insured cease to be totally disabled before the policy anniversary nearest the insured's 65th birthday:

>> a. further specified frequency premium amounts will not be credited or paid; and

>> b. any specified frequency premium amounts already credited or paid after that date will be charged as loans against the policy unless repaid to us.

  15. Based on the information submitted by Korn and/or obtained by Phoenix, as well as the terms of the Policy and Policy Rider, Phoenix has upheld its denial of the disability payment of premium benefit as Phoenix lacks due proof that Korn is totally disabled under the Policy Rider and entitled to the benefit.

16.     Korn contends he is entitled to the disability payment of premium benefit under the Policy Rider.

## IV.  CAUSES OF ACTION

## COUNT ONE:  DECLARATORY JUDGMENT

17.     Plaintiff hereby incorporates the facts set out above herein.

18.     The purpose of a declaratory judgment action is to declare the rights and other legal relations of any interested party in a case of actual controversy.  28 U.S.C. § 2201.

19.     Phoenix brings this action seeking a declaration that Phoenix has no obligation to Korn under the Policy Rider.  As set forth above, Korn is not entitled to receive benefits under the Policy Rider.  Korn has failed, or declined, to provide due proof of total disability and continued disability as required by the Policy Rider and/or has provided contradictory, false or misleading information in order to obtain benefits under the Policy Rider.  Korn has threatened litigation in the event that Phoenix fails to reinstate benefits under the Policy Rider.

20.     Had Phoenix known of the misstatements, misrepresentations, and/or omissions at the time it initially processed Korn's claim for benefits under the Policy Rider as well as Korn's true work ability, Phoenix would not have approved Korn's benefits under the Policy Rider.  As such, Phoenix also requests the Court to declare that Phoenix is entitled to recover any past premiums paid or credited under the Policy Rider that were approved as a result of misstatements, misrepresentations, and/or omissions by Korn or his representatives.

21.     Phoenix also requests that the Court award its attorneys' fees to the extent allowed under Pennsylvania law.  The Court may award costs and reasonable and necessary attorneys' fees in a diversity action when applicable state law would provide for them. Under the

Declaratory Judgment Act, the Court may award reasonable and necessary attorneys' fees as supplemental relief. 42 Pa.C.S. § 7538.

22.     For the reasons stated above, an actual controversy exists between Phoenix and Korn that is within the jurisdiction of this Court and involves the rights and liabilities under the Policy and Policy Rider.

## COUNT TWO:  FRAUD/RESTITUTION

23.     Plaintiffs hereby incorporate the facts set out above herein.

24.     In addition or alternatively to other counts, Phoenix pleads for recovery against Korn for fraud.

25.     Korn made various representations pertaining to his alleged disability and inability to work in making a claim for benefits under the Policy Rider, including but not limited to, that he is unable to engage in any gainful activity, that he is no longer the CEO or Chairman of Bengal, or is not acting as the CEO or Chairman of Bengal, and that he is not actively involved in the management or operations of Bengal or other investments.

26.     Korn had a duty to act in good faith and deal fairly in connection with the Policy and Policy Rider.

27.     Korn's representations as to the nature and extent of his claimed disability and inability to work were material.

28.     Korn's representations as to the nature and extent of his claimed disability and inability to work were false.  Specifically, it has been discovered that Korn continues to work and/or act as President, CEO or Chairman of Bengal and hold himself out as "President/CEO," that he is involved in the management or operations of Bengal and other investments, that he makes business decisions, supervises employees, fires employees, and is otherwise capable of working.  It has also been discovered that these activities have been ongoing for years.

7

29.     When Korn made the representations as to the nature and extent of his claimed disability and inability to work to Phoenix, Korn knew the representations were false.

30.     Korn made the representations as to the nature and extent of his claimed disability and inability to work with the intent that Phoenix rely upon them.

31.     Phoenix relied on Korn's representations as to the nature and extent of his claimed disability and inability to work in determining whether to approve and/or continue benefits under the Policy Rider.

32.     Korn's misrepresentations as to the nature and extent of his claimed disability and inability to work caused Phoenix injury.

33.     Phoenix requests that the Court award all damages that it suffered due to Korn's fraud, including its attorneys' fees.

34.     Phoenix further requests that the Court award restitution of any premiums paid or credited by Phoenix as a result of Korn's fraud.

## V. **PRAYER**

WHEREFORE, Defendant Phoenix Life Insurance Company respectfully requests that a judgment be entered in its favor and against Defendant Scott Korn:

(a)     declaring that Korn is not entitled to the disability payment of premium benefit under the Disability Payment of Specified Annual Premium Amount Rider to Policy No. 11198960;

(b)     declaring that Phoenix Life Insurance Company is under no duty or obligation to pay Defendant Scott Korn any disability payment of premium pursuant to the terms of the Disability Payment of Specified Annual Premium Amount Rider to Policy No. 11198960;

(c)     declaring that Phoenix Life Insurance Company is entitled to recover any prior premium paid or credited under the Disability Payment of Specified Annual Premium Amount Rider to Policy No. 11198960;

(d)     awarding Phoenix Life Insurance Company restitution of amounts paid to Korn under the Disability Payment of Specified Annual Premium Amount Rider to Policy No. 11198960; and

(e)     awarding Phoenix Life Insurance Company any and all compensatory and punitive damages, prejudgment interest, post judgment interest, costs of suit, reasonable attorneys' fees to the extent allowed by law, and such other relief as this Court deems equitable and just.

**Dated: March 13, 2017.**

Respectfully submitted,

By: _____
Steven J. Schildt (I.D. # 79011)

POST & SCHELL, P.C.
Four Penn Center
1600 John F. Kennedy Blvd., 13th Floor
Philadelphia, Pennsylvania 19103
Email: sschildt@postschell.com

-and-

Thomas F. A. Hetherington*
Jennifer H. Frank*

EDISON, MCDOWELL & HETHERINGTON, LLP
1001 Fannin Street, Suite 2700
Houston, Texas 77002
Telephone:  (713) 337-5580
Facsimile:  (713) 337-8850
E-Mail:  tom.hetherington@emhllp.com
E-Mail:  jennifer.frank@emhllp.com

9

*To be admitted pro hac vice*

**ATTORNEYS FOR PLAINTIFF PHOENIX
LIFE INSURANCE COMPANY**

# EXHIBIT 1

Main Administrative Office
One American Row   PO Box 5056
Hartford Connecticut 06102-5056

Statutory Home Office
15 Tech Valley Drive
East Greenbush, NY 12061

INSURED:   SCOTT H KORN

39   MALE :ISSUE AGE AND SEX

POLICY NUMBER:   11198960

DECEMBER 18, 2001 :POLICY DATE

FACE AMOUNT:   $15,000,000.00

Dear Policyowner:

We agree to pay the benefits of this policy in accordance with its provisions. It is important to us that you are satisfied with your policy and that it meets your insurance goals. For service or information on this policy, contact the agent who sold the policy, any of our agency offices, or our Variable Products Operations at the following address:

**Phoenix Variable Products Mail Operation**
**P.O. Box 8027**
**Boston, MA 02266-8027**

RIGHT TO CANCEL. You have the right to cancel this policy within a limited time after the policy is delivered to you. The policy may be cancelled by returning the policy to us at our Variable Products Mail Operation or to our agency office or to the agent through whom it was purchased before the later of:

1. 10   days after the policy is delivered to you; or
2. 10   days after a Notice of Right to Cancel is delivered to you; or
3. 45   days after Part 1 of the application is signed;

for a refund of any premiums paid.

Signed for Phoenix Home Life Mutual Insurance Company at its Main Administrative Office at Harford, Connecticut.

Sincerely yours,

_James D. Wehr_

Secretary

Chief Executive Officer

## FLEXIBLE PREMIUM VARIABLE UNIVERSAL LIFE INSURANCE POLICY

THE DEATH BENEFIT AND OTHER VALUES PROVIDED UNDER THIS POLICY ARE BASED ON THE RATES OF INTEREST CREDITED ON ANY AMOUNTS ALLOCATED TO THE GUARANTEED INTEREST ACCOUNT AND THE INVESTMENT EXPERIENCE OF THE SUB-ACCOUNTS WITHIN OUR SEPARATE ACCOUNT TO WHICH YOUR PREMIUMS ARE ALLOCATED. THUS, THE DEATH BENEFIT, POLICY VALUE, AND CASH SURRENDER VALUE MAY INCREASE OR DECREASE IN AMOUNT OR DURATION IN ACCORDANCE WITH THE EXPERIENCE OF THE SEPARATE ACCOUNT. SEE PART 7 FOR A DESCRIPTION OF HOW THE DEATH BENEFIT IS DETERMINED.

V603 PA                    **Eligible for Annual Dividends**                    VX03PAF1

SCHEDULE PAGE
BASIC INFORMATION

INSURED: SCOTT H KORN

39   MALE :ISSUE AGE AND SEX

POLICY NUMBER: 11198960

DECEMBER 18, 2001 :POLICY DATE

FACE AMOUNT: $15,000,000.00

OWNER AS STATED IN THE APPLICATION UNLESS LATER CHANGED.

DEATH BENEFIT OPTION: DEATH BENEFIT OPTION 1 OR AS LATER CHANGED AS PROVIDED HEREIN.

BENEFICIARY AS STATED IN THE APPLICATION UNLESS LATER CHANGED.

PREMIUMS

ISSUE PREMIUM:     $33,000.00   DUE ON DECEMBER 18, 2001

SUBSEQUENT PLANNED MONTHLY PREMIUM:        $2,500.00

TOTAL PREMIUM LIMIT:GREATER OF   $2,390,752.04   AND RESULT OF     $218,416.51 MULTIPLIED
BY THE NUMBER OF ELAPSED POLICY YEARS (OR FRACTION THEREOF) AFTER
DECEMBER 18, 2001

PREMIUM DUE DATES:  THE AMOUNT AND TIME OF PREMIUM PAYMENTS FOLLOWING THE
POLICY DATE ARE FLEXIBLE.  SUBSEQUENT PLANNED PREMIUMS ARE
PAYABLE ON THE EIGHTEENTH      DAY OF EACH MONTH       THEREAFTER
FOR THE LIFE OF THE INSURED, BUT NOT BEYOND DECEMBER 18, 2062

SUBACCOUNT ALLOCATION SCHEDULE ON THE POLICY DATE

| SUBACCOUNT | PREMIUMS | MONTHLY DEDUCTIONS* |
|---|---|---|
| Virtus CapitalGrowth | 15.0% | PROPORTIONATE |
| Virtus Strat Allocat | 20.0% | PROPORTIONATE |
| Virtus International | 10.0% | PROPORTIONATE |
| Wanger USA | 5.0% | PROPORTIONATE |
| Wanger International | 5.0% | PROPORTIONATE |
| Virtus Sm-Cap Value | 10.0% | PROPORTIONATE |
| Virtus Sm-Cap Growth | 15.0% | PROPORTIONATE |
| Invesco Core Equity | 10.0% | PROPORTIONATE |
| Federated PrimeMoney | 10.0% | PROPORTIONATE |

* SEE PART 1 FOR DEFINITION OF PROPORTIONATE. SUBACCOUNTS MARKED "NONE" WILL
BE CHARGED WITH A PORTION OF THE MONTHLY DEDUCTION ONLY IF THE
SUBACCOUNTS ARE NOT SUFFICIENT TO MAKE THE FULL MONTHLY DEDUCTION.

SCHEDULE PAGE (continued)

INSURED: SCOTT H KORN                               POLICY NUMBER: 11198960

## GENERAL ACCOUNT SUBACCOUNTS

**GUARANTEED
INTEREST
ACCOUNT (GIA)**

The Guaranteed Interest Account is not part of the Separate Account. We reserve the right to limit cumulative premium deposits made to the Guaranteed Interest Account during any one-week period to not more than $250,000. It is accounted for as part of our General Account. We will credit interest daily on any amounts held under the Guaranteed Interest Account at such rates as we shall determine but in no event will the effective annual rate of interest be less than 4%. On the last working day of each calendar week, We shall set the interest rate that will apply to any premium deposit made to the unloaned portion of the Guaranteed Interest Account, during the applicable period of that month. That rate will remain in effect for such premium deposits for an initial guaranteed period, of one full year. Upon expiry of the initial one-year guarantee period, and for any premium deposits whose guarantee has just ended, the applicable rate shall be the same rate that applies to new premium deposits made at the time the guarantee period expires. Such rate shall likewise remain in effect for such premium deposits for a subsequent guarantee period of one full year.

SCHEDULE PAGE
(CONTINUED)

INSURED: SCOTT H KORN                    POLICY NUMBER: 11198960

SEPARATE ACCOUNT SUB-ACCOUNT FEES

MAXIMUM DAILY MORTALITY AND EXPENSE RISK FEE:
        0.0000219 (BASED ON ANNUAL RATE OF 0.80% FOR 15 YEARS)
        0.0000068 (BASED ON ANNUAL RATE OF 0.25% AFTER 15 YEARS)

MAXIMUM DAILY TAX FEE: 0 OR SUCH GREATER AMOUNT AS MAY BE ASSESSED AS A RESULT
OF A CHANGE IN TAX LAWS.

POLICY CHARGES

ISSUE EXPENSE CHARGE:  $600.00

ISSUE EXPENSE CHARGE
FOR FACE INCREASES
AFTER POLICY DATE:        $1.50 PER THOUSAND OF FACE INCREASE, BUT NOT TO
                                    EXCEED $600.00.

PREMIUM TAX CHARGE:       2.25 % OF PREMIUMS.

FEDERAL TAX CHARGE:       1.50 % OF PREMIUMS.

MONTHLY DEDUCTION:        SEE PART 4, "MONTHLY DEDUCTION". INCLUDES COST OF
                                    INSURANCE, ANY RIDER CHARGES, ANY FLAT EXTRA  MORTALITY
                                    CHARGES AND A MONTHLY ADMINISTRATIVE CHARGE WHICH SHALL
                                    NOT EXCEED $10.00 AND ONE-TWELFTH OF THE ISSUE EXPENSE
                                    CHARGE FOR THE FIRST POLICY YEAR AND FOR THE FIRST POLICY
                                    YEAR AFTER AN INCREASE IN FACE AMOUNT.

MAXIMUM TRANSFER        $0 - FIRST TWO TRANSFERS PER POLICY YEAR.
CHARGE:                 $10 - SUBSEQUENT TRANSFERS PER POLICY YEAR.

PARTIAL SURRENDER FEE:  LESSER OF $25.00 OR 2% OF PARTIAL SURRENDER AMOUNT PAID.

SURRENDER CHARGE:       SEE TABLE ON NEXT PAGE

OTHER RATES:

GUARANTEED INTEREST ACCOUNT:

   UNLOANED PORTION:       MINIMUM RATE 4%

   LOANED PORTION:         2%

LOAN INTEREST RATE:     4% FOR THE FIRST 10 POLICY YEARS OR UNTIL AGE 65 WHICHEVER
                                    IS SOONER; 3% THEREAFTER, UNTIL THE END OF THE 15TH POLICY
                                    YEAR OR UNTIL AGE 65, WHICHEVER IS SOONER; 2.25%
                                    THEREAFTER.

SCHEDULE PAGE
(CONTINUED)

INSURED: SCOTT H KORN                    POLICY NUMBER: 11198960

SURRENDER CHARGE

IN POLICY YEARS 1 THROUGH 10 THE FULL SURRENDER CHARGE IS GIVEN IN THE TABLE BELOW. THE APPLICABLE SURRENDER CHARGE IN ANY POLICY MONTH IS THE FULL SURRENDER CHARGE MINUS ANY SURRENDER CHARGES PREVIOUSLY PAID, BUT NOT LESS THAN ZERO. IN ALL POLICY YEARS AFTER THE 10TH POLICY YEAR, THE SURRENDER CHARGE IS ZERO.

## MAXIMUM SURRENDER CHARGE TABLE

| POLICY MONTH | SURRENDER CHARGE | POLICY MONTH | SURRENDER CHARGE | POLICY MONTH | SURRENDER CHARGE |
|---|---|---|---|---|---|
| 1- 12 | 300,646.39 | 77 | 232,499.87 | 99 | 136,774.06 |
| 13- 24 | 300,646.39 | 78 | 228,491.26 | 100 | 130,253.38 |
| 25- 36 | 300,646.39 | 79 | 224,482.64 | 101 | 123,732.69 |
| 37- 48 | 300,646.39 | 80 | 220,474.02 | 102 | 117,212.00 |
| 49- 60 | 300,646.39 | 81 | 216,465.40 | 103 | 110,691.32 |
| 61 | 296,637.77 | 82 | 212,456.78 | 104 | 104,170.63 |
| 62 | 292,629.15 | 83 | 208,448.16 | 105 | 97,649.94 |
| 63 | 288,620.53 | 84 | 204,439.54 | 106 | 91,129.26 |
| 64 | 284,611.92 | 85 | 200,430.93 | 107 | 84,608.57 |
| 65 | 280,603.30 | 86 | 196,422.31 | 108 | 78,087.89 |
| 66 | 276,594.68 | 87 | 192,413.69 | 109 | 71,567.20 |
| 67 | 272,586.06 | 88 | 188,405.07 | 110 | 65,046.51 |
| 68 | 268,577.44 | 89 | 184,396.45 | 111 | 58,525.83 |
| 69 | 264,568.82 | 90 | 180,387.83 | 112 | 52,005.14 |
| 70 | 260,560.20 | 91 | 176,379.21 | 113 | 45,484.45 |
| 71 | 256,551.59 | 92 | 172,370.59 | 114 | 38,963.77 |
| 72 | 252,542.97 | 93 | 168,361.98 | 115 | 32,443.08 |
| 73 | 248,534.35 | 94 | 164,353.36 | 116 | 25,922.40 |
| 74 | 244,525.73 | 95 | 160,344.74 | 117 | 19,401.71 |
| 75 | 240,517.11 | 96 | 156,336.12 | 118 | 12,881.02 |
| 76 | 236,508.49 | 97 | 149,815.43 | 119 | 6,360.34 |
|  |  | 98 | 143,294.75 | 120 | .00 |

SCHEDULE PAGE
(CONTINUED)

INSURED: SCOTT H KORN                    POLICY NUMBER: 11198960

TABLE OF GUARANTEED MAXIMUM COST OF INSURANCE RATES
BASED ON 1980 CSO MORTALITY TABLE MALE   NON-SMOKER
PER $1,000 OF NET AMOUNT AT RISK
RISK CLASSIFICATION: MALE  ADVANTAGE PREMIER

| ATTAINED AGE | MONTHLY RATE | ATTAINED AGE | MONTHLY RATE | ATTAINED AGE | MONTHLY RATE |
|---|---|---|---|---|---|
| 39 | 0.17830 | 60 | 1.05330 | 81 | 8.54330 |
| 40 | 0.19080 | 61 | 1.16170 | 82 | 9.37670 |
| 41 | 0.20580 | 62 | 1.28500 | 83 | 10.31580 |
| 42 | 0.22080 | 63 | 1.42580 | 84 | 11.34250 |
| 43 | 0.23830 | 64 | 1.58500 | 85 | 12.43330 |
| 44 | 0.25580 | 65 | 1.76080 | 86 | 13.56670 |
| 45 | 0.27670 | 66 | 1.95000 | 87 | 14.73250 |
| 46 | 0.29920 | 67 | 2.15500 | 88 | 15.90750 |
| 47 | 0.32330 | 68 | 2.37500 | 89 | 17.10750 |
| 48 | 0.34920 | 69 | 2.61500 | 90 | 18.34920 |
| 49 | 0.37830 | 70 | 2.88580 | 91 | 19.65330 |
| 50 | 0.40920 | 71 | 3.24250 | 92 | 21.06250 |
| 51 | 0.44580 | 72 | 3.54670 | 93 | 22.63580 |
| 52 | 0.48830 | 73 | 3.95330 | 94 | 24.63750 |
| 53 | 0.53580 | 74 | 4.41000 | 95 | 27.49670 |
| 54 | 0.59080 | 75 | 4.90000 | 96 | 32.04580 |
| 55 | 0.65170 | 76 | 5.42170 | 97 | 40.01670 |
| 56 | 0.71920 | 77 | 5.97000 | 98 | 54.83170 |
| 57 | 0.79080 | 78 | 6.53920 | 99 | 83.33330 |
| 58 | 0.86830 | 79 | 7.14330 | | |
| 59 | 0.95580 | 80 | 7.80580 | | |

SCHEDULE PAGE
(CONTINUED)

INSURED: SCOTT H KORN                      POLICY NUMBER: 11198960

TABLE OF FACE AMOUNTS OF INSURANCE

| ISSUE DATE | FACE AMOUNT | RISK CLASSIFICATION |
|---|---|---|
| DECEMBER 18, 2001 | $15,000,000.00 | MALE PREFERRED |

RIDERS AND RIDER BENEFITS

| RIDER DESCRIPTION | RIDER DATE | AMOUNT | PAYABLE TO | MONTHLY CHARGE |
|---|---|---|---|---|
| VR08   VARIABLE LIFE POLICY EXCHANGE OPTION RIDER | 12/18/2001 | | | NONE |
| VR130 TEMPORARY MONEY MARKET ALLOCATION AMENDMENT | | | | |
| VR148 DISABILITY PAYMENT OF SPECIFIED ANNUAL PREMIUM AMOUNT | 12/18/2001 | $100,000.00 | 12/18/2027 | $263.60 |
| VR39 - AGE 100+ RIDER | 12/18/2001 | | | |

# TABLE OF CONTENTS

| Part | Page |
|---|---|
| Schedule Page(s) | |
| Basic Information | |
| Description of Sub-accounts | |
| Policy Charges and Rates | |
| Table of Surrender Charges | |
| Table of Guaranteed Maximum Insurance Rates | |
| Table of Face Amounts of Insurance and Riders | |

Table of Contents

| Part | Page |
|---|---|
| 1. Definitions | 1-2 |
| 2. About the Policy | 2 |
| Effective Date of Insurance | 2 |
| Entire Contract | 2 |
| Dividends | 2 |
| Contestability | 2 |
| Suicide | 3 |
| Misstatement of Age or Sex | 3 |
| Assignments | 3 |
| Annual Reports | 4 |
| Transaction Rules | 4 |
| 3. Rights of Owner | 4 |
| Who is the Owner | 4 |
| What are the Rights of the Owner | 4 |
| How to Change the Owner | 5 |
| 4. Premiums and Charges | 5 |
| Premium Payments | 5 |
| Premium Deductions | 5 |
| Net Premium Allocation to Sub-Accounts | 6 |
| PremiumFlexibility | 6 |
| Total Premium Limit | 6 |
| Grace Period & Lapse | 7 |
| Reinstatement | 7 |
| Policy Value | 7 |
| Monthly Deduction | 7 |
| 5. The Accounts | 8 |
| Guaranteed Interest Account | 9 |
| Separate Account | 9 |
| Voting Rights | 10 |
| Share of Separate Account Sub-Account Values | 10 |
| Unit Value | 10 |
| Net Investment Factor | 11 |

| Part | Page |
|---|---|
| 6. Lifetime Benefits | 11 |
| Transfers | 11 |
| Loans | 12 |
| Loan Interest | 13 |
| Cash Surrender Value | 13 |
| Full Surrender | 13 |
| Partial Surrender | 13 |
| Additional Insurance Option | 14 |
| 7. Death Benefits | 15 |
| Death Benefit Option 1 | 15 |
| Death Benefit Option 2 | 15 |
| Minimum Death Benefit | 15 |
| Death Benefit Following Insured's Age 100 | 16 |
| How to Change the Death Benefit Option | 16 |
| Request for an Increase in Face Amount | 16 |
| Right to Cancel Face Amount Increases | 17 |
| Request for Decrease in Face Amount | 17 |
| Death Proceeds | 17 |
| Interest on Death Proceeds | 18 |
| The Beneficiary | 18 |
| How to Change the Beneficiary | 18 |
| 8. Payment Options | 18 |
| Who May Elect Payment Options | 18 |
| How to Elect a Payment Option | 18 |
| Payment Options | 19 |
| (1) Payment in One Sum | 19 |
| (2) Left to Earn Interest | 19 |
| (3) Payments for a Specified Period | 19 |
| (4) Life Annuity with Specified Period Certain | 19 |
| (5) Life Annuity | 20 |
| (6) Payments of Specified Amount | 20 |
| (7) Joint Survivorship Annuity with 10-year Period Certain | 20 |
| Additional Interest | 20 |
| 9. Tables of Payment Option Amounts | 21 |

# PART 1:  DEFINITIONS

**Attained Age**

Age of the insured on the birthday nearest the most recent policy anniversary.

**Debt**

Unpaid loans against this policy plus accrued interest.

**Gender**

The terms "he," "his" and "him" are applicable without regard to sex. Where proper, "she," "hers" or "her" may be substituted.

**In Force**

The policy has not terminated.

**In Writing (Written Request)**

In a written form satisfactory to us and filed at our VUL.

**VUL**

Our Variable and Universal Life Administration. The address is shown on the cover page of this policy.

**Monthly Calculation Day**

The first Monthly Calculation Day of a policy is the same day as its Policy Date as shown on the Schedule Page. Subsequent Monthly Calculation Days are the same day for each month thereafter or, if such day does not fall within a given month, the last day of that month will be the Monthly Calculation Day.

**Payment Date**

The Valuation Date on which a premium payment or loan repayment is received at our VUL unless it is received after the close of the New York Stock Exchange in which case it will be the next Valuation Date.

**Policy Anniversary**

The anniversary of the Policy Date.

**Policy Date**

The policy date as shown on the Schedule Page. It is the date from which policy years and policy anniversaries are measured.

**Policy Month**

The period from one Monthly Calculation Day up to, but not including, the next Monthly Calculation Day.

**Policy Value**

The policy value as defined in Part 4.

**Policy Year**

The first policy year is the one-year period from the Policy Date to, but not including, the first policy anniversary. Each succeeding policy year is the one-year period from the period from the policy anniversary to but not including the next policy anniversary.

**Proportionate**

Amounts are allocated to sub-accounts on a proportionate basis such that the ratios of this policy's sub-account values to each other are the same before and after the allocation.

**Separate Account**

Phoenix Home Life Variable Universal Life Account.

**Sub-Accounts**

The Guaranteed Interest Account (exclusive of the loaned portion of such account) and the accounts within our Separate Account to which non-loaned assets under the policy are allocated as described in Part 5.

If we successfully contest the validity of all or a portion of the face amount provided under this policy, the amount we pay with respect to such portion of the face amount will be limited to a return of any paid premium for the contested Face Amount, less any policy debt and any partial surrender amounts paid corresponding to the contested face amount.

**Suicide**

If within two years from the Policy Date the insured dies by suicide, while sane or insane, and while this policy is in force, the amount of death benefit will be limited to the sum of premiums paid less any policy debt and less any partial surrender amounts paid.

If within two years from the issue date of an increase in face amount the insured dies by suicide, while sane or insane, and while the policy is in force, the death benefit for that increase will be limited to a pro–rata portion of the sum of premiums paid corresponding to such increase less a pro–rata portion of any policy debt and any partial surrender amounts paid corresponding to such increase.

**Misstatement of Age or Sex**

If the age or sex of the insured has been misstated, any benefits payable under this policy will be adjusted to reflect the correct age and sex as follows:

(A) For adjustments made prior to the insured's death, no change will be made to the then current policy value, but subsequent cost of insurance rates will be adjusted to such rates that would apply had this policy been issued based on the correct age and sex.

(B) For adjustments made at the time of the insured's death, the death benefit payable will be adjusted to reflect the amount of coverage that would have been supported by the most recent monthly deduction based on the then current policy value for the correct age and sex.

**Assignments**

Except as otherwise provided herein, any or all of the rights in this policy may be assigned. We will not be considered to have notice of any assignment until we receive the original or copy of the assignment at our VUL. We are not responsible for the validity of any assignment.

**Annual Reports**

We will annually send you a report showing for this policy:

a. the then current policy value, cash surrender value, death benefit and face amount;

b. the premiums paid, and deductions and partial surrenders made since the last report;

c. any outstanding debt;

d. an accounting of the change in policy value since the last report; and

e. such additional information as required by applicable law or regulation.

**Transaction Rules**

Requests for transactions involving sub-accounts will usually be processed within 7 days after we receive the written request at our VUL. However, we may, at our discretion, postpone the payment of any death benefit in excess of the initial face amount, any policy loans or partial withdrawals, except when used to pay premiums, surrenders or transfers:

(A) For up to six months from the date of request, for any transactions dependent upon the value of the Guaranteed Interest Account; or

(B) Otherwise, for any period during which the New York Stock Exchange is closed for trading (except for normal holiday closing) or when the Securities and Exchange Commission has determined that a state of emergency exists which may make processing such transactions impractical.

## PART 3: RIGHTS OF OWNER

**Who is the Owner**

The owner is the person named as owner in the application, unless later changed as provided in this policy. If you, the owner, are not the insured and you die before the insured, ownership rights in this policy will pass to the successive owner if one has been named, except that if joint owners are designated, this policy would remain with the surviving joint owners until death of the last surviving joint owner. The insured or the insured's estate will be the owner if no other person is named the owner. If more than one person is named as owner, they must act jointly unless you and we agree otherwise.

**What are the Rights of the Owner**

You control this policy during the insured's lifetime but not until this policy begins in force. Unless you and we agree otherwise, you may exercise all rights provided under this policy without the consent of anyone else.  These rights include the right to:

a. Receive any amounts payable under this policy during the insured's lifetime.

b. Change the owner or the interest of any owner.

c. Change the planned premium payment amount and frequency. See Part 4.

d. Change the sub-account allocation schedule for premium payments and monthly deductions. See Part 4.

e. Transfer amounts between and among sub-accounts. See Part 6.

f. Obtain policy loans. See Part 6.

g. Obtain a partial surrender. See Part 6.

h. Surrender this policy for its cash surrender value. See Part 6.

i. Select a payment option for any cash surrender value that becomes payable. See Part 6.

j. Request changes in the insurance amount. See Part 7.

k. Change the beneficiary of the death benefit. See Part 7.

l. Assign, release, or surrender any interest in the policy.

m. Change the death benefit option. See Part 7.

You may exercise these rights only while the insured is alive. Exercise of any of these rights will, to the extent thereof, assign, release, or surrender the interest of the insured and all other beneficiaries and owners under this policy.

**How to Change the Owner**

You may change the owner by written request, in a form satisfactory to us, filed at our VUL.

# PART 4:  PREMIUMS

**Premium Payments**

The issue premium as shown on the Schedule Page is due on the Policy Date. The insured must be alive when the issue premium is paid. Thereafter, the amount and payment frequency of planned premiums are as shown on the Schedule Page unless later changed as described below. All premiums are payable at our VUL, except that the issue premium may be paid to an authorized agent of ours for forwarding to our VUL.

**Premium Deductions**

Premium tax charges and federal tax charges as stated on the Schedule Page, will be deducted from any premiums received by us at our VUL. If the issue premium is received by us at our VUL after the policy date, then it will also be reduced by the amount necessary to cover any past unpaid monthly deductions described below. In addition, payments received by us during a grace period will also be reduced by the amount needed to cover any monthly deductions during the grace period.

**Net Premium Allocation to Sub-accounts**

The premiums, net of these charges, will be applied on the Payment Date to the various sub-accounts based on the premium allocation schedule elected in the application for this policy or as later changed by you. You may change the allocation schedule for premium payments by written notice filed with us at our VUL. Allocations to each sub-account must be expressed in whole percentages unless we agree otherwise.

The number of units credited to each sub-account of the Separate Account will be determined by dividing the net premium applied to that sub-account by the unit value of that sub-account on the Payment Date. The number of units credited to each sub-account is carried to four decimal places.

**Premium Flexibility**

Subject to the total premium limit described in the next section and except for the issue premium, you may change the amount and frequency of premium payments while this policy is in force during the lifetime of the insured as follows:

a. You may increase or decrease the planned premium amount or payment frequency at any time by written notice to us.

b. Additional premium payments may be made at any time.

c. Each premium payment made must at least equal $25 or, if during a grace period, the amount needed to prevent lapse of this policy. We reserve the right to reduce this limit.

**Total Premium Limit**

The total premium limit is shown on the Schedule Page and is applied to the sum of all premiums received by us for this policy to date, reduced by the sum of all partial surrender amounts paid by us to date. If the total premium limit is exceeded, we will pay you the excess, with interest at an annual rate of not less than 4%, not later than 60 days after the end of the policy year in which the limit was exceeded. The policy value will be adjusted to reflect such refund. The amount to be taken from the sub-account will be allocated in the same manner as provided for monthly deductions unless you request another allocation in writing.

The total premium limit may be exceeded if additional premium is needed to prevent lapse under the grace period and lapse provision. The total premium limit may change due to:

a. a partial surrender or a decrease in face amount;

b. addition, cancellation, or change of a rider; or

c. a change in federal tax laws or regulations.

If the total premium limit changes, we will send you a Revised Schedule Page reflecting the change. However, we reserve the right to require that this policy be returned to us so that we may endorse the change.

**Grace Period and Lapse**    If, on any Monthly Calculation Day, the required monthly deduction exceeds the policy value during the first three policy years, or the cash surrender value after the third policy year, a grace period of 61 days will be allowed for the payment of an amount equal to three times the required monthly deduction. This policy will continue in force during any such grace period. We will mail a written notice to you and any assigns at the post office addresses last know to us as to the amount of premium required. If such premium is not paid to us by the end of the grace period this policy will lapse without value, but not before 61 days have elapsed since we mailed our written notice to you. The "date of lapse" will be the Monthly Calculation Day on which the deduction was to be made, and any insurance and rider benefits provided under this policy will terminate as of that date.

**Reinstatement**    Unless the policy has been surrendered for its cash surrender value, the policy may be reinstated at any time within three years from the date of lapse upon written application therefore, the submission of evidence of insurability satisfactory to us, and the payment of any unpaid monthly deductions due during the grace period. Also required is the payment or reinstatement of any indebtedness upon the policy.

**Policy Value**    The policy value on the policy date is equal to the issue premium net of all premium deductions as stated in the Premium Deductions provision above, and minus the first month's monthly deduction as stated in the Monthly Deduction provision, below. The policy value on any subsequent date is the sum of this policy's share in the value of each sub-account of the Separate Account and the value of this policy's Guaranteed Interest Account. See Part 5 for an explanation as to how this policy's share in the value of each sub-account of the Separate Account is determined and for a description of the Guaranteed Interest Account.

**Monthly Deduction**    A deduction is made each policy month from the policy value (excluding the value of the loaned portion of the Guaranteed Interest Account) to pay:

(a)  the cost of insurance provided under this policy;

(b)  any flat extra mortality charges;

(c)  the cost of any rider benefits provided;

(d)  an administrative charge as shown on the Schedule Page. The administrative charge may vary but in no event will exceed the maximum amount shown on the Schedule Page. We will send you a written notice of any change at least 30 days in advance of such change; and

(e)  for the first policy year and for the first policy year after a face amount increase, one twelfth of the Issue Expense charge shown on the Schedule Page. Any unpaid balance of the Issue Expense Charge will be paid to us upon policy lapse or termination.

Deductions are made on each Monthly Calculation Day. If the Monthly Calculation Day is not a valuation date, the monthly deduction for that policy month will be made on the next valuation date.

You may request in the application for this policy that monthly deductions not be taken from certain specified sub-accounts. Such a request may later be changed by notifying us in writing, but only with respect to future monthly deductions. Monthly deductions will be taken from this policy's share of the remaining sub-accounts exclusive of the loaned portion of the Guaranteed Interest Account, on a proportionate basis. In the event this policy's share in the value of such sub-accounts is not sufficient to permit the withdrawal of the full monthly deduction, the remainder will be taken on a proportionate basis from this policy's share of each of the other sub-accounts exclusive of the loaned portion of the Guaranteed Interest Account. The number of units deducted from each sub-account of the Separate Account will be determined by dividing the portion of the monthly deduction allocated to each such sub-account by the unit value of that sub-account on the Monthly Calculation Day.

Each monthly deduction will pay the cost of insurance from the Monthly Calculation Day on which the deduction is made up to, but not including, the next Monthly Calculation Day. The cost of insurance is equal to the cost of insurance rate for the current policy month divided by 1,000 and then multiplied by the result of:

(a) the death benefit on the Monthly Calculation Day; minus

(b) the policy value on the Monthly Calculation Day.

The cost of insurance rate for the current policy month is based on the insured's attained age and risk classification. The rate used in computing the cost of insurance is obtained from the Table of Guaranteed Maximum Cost of Insurance Rates on the Schedule Page for the risk classification(s) shown, or such lower rate as we may declare. Any change we make in the declared cost of insurance rates will be uniform by class and based on our future mortality, expense and lapse expectations. The declared cost of insurance rates for an insured will not be affected by a change in the insured's health or occupation.

## PART 5:   THE ACCOUNTS

Assets under this policy may be allocated either to the Guaranteed Interest Account or to any of the sub-accounts of the Separate Account.

**Guaranteed Interest Account**

The Guaranteed Interest Account is not part of the Separate Account. It is part of our General Account. We reserve the right to limit cumulative premium deposits, including transfers, to the unloaned

portion of the Guaranteed Interest Account during any one-week period to no more than $250,000. We will credit interest daily on the amounts allocated under this policy to the Guaranteed Interest Account. The loaned portion of the Guaranteed Interest Account will be credited interest at an effective annual fixed rate as shown on the Schedule Page. We will credit interest on the unloaned portion of the Guaranteed Interest Account at such rates as we shall determine but in no event will the effective annual rate of interest on such portion be less than the minimum interest rate shown on the Schedule Page.

Twice each calendar month we will set the interest rate that will apply to any net premium or transferred amounts deposited to the unloaned portion of the Guaranteed Interest Account during the applicable period of that month. That rate will remain in effect for such premium deposits, for an initial guarantee period of one full year. Upon expiry of the initial one-year guarantee period, and each subsequent one-year guarantee period thereafter, the rate applicable for any premium deposits in the unloaned portion of the Guaranteed Interest Account whose guarantee period has just ended shall be the same rate that applies to new premium deposits to such sub-account at the time the guarantee period expires. Such rate shall likewise remain in effect for such premium deposits for a subsequent guarantee period of one full year.

All transfers, partial surrenders, and deductions from the unloaned portion of the Guaranteed Interest Account will be assessed on a Last-In, First-Out basis based on the date the premium deposit was initially made to the unloaned portion of such sub-account. At the end of each policy year and at the time of any debt repayment, interest credited to the loaned portion of the Guaranteed Interest Account will be transferred to the unloaned portion of the Guaranteed Interest Account. We reserve the right to add other Guaranteed Interest Accounts, subject, where required, to approval by the insurance supervisory official of the state where this policy is delivered.

**Separate Account**

The Separate Account has been established by us as a separate account pursuant to New York law and is registered as a unit investment trust under the Investment Company Act of 1940 (1940 Act). Income and realized and unrealized gains and losses from assets in the Separate Account are credited to or charged against it without regard to our other income, gains or losses. We own the Separate Account assets and they are kept separate from the Assets of our General Account. Separate Account assets will be valued on each valuation date. The portion of the Separate Account equal to reserves and liabilities for policies supported by the Separate Account will not be charged with any liabilities arising out of our other business. We reserve the right to use assets of the Separate Account in excess of these reserves and liabilities for any purposes.

The Separate Account has several sub-accounts available under this policy as shown on the Schedule Page. We have the right to add

additional sub-accounts of the Separate Account subject to approval by the Securities and Exchange Commission and, where required, by the insurance supervisory official of the state where this policy is delivered. We use the assets of the Separate Account to buy shares of the Fund identified on the Schedule Page according to your allocation instructions. The Fund is registered under the 1940 Act as an open-end, diversified management investment company. The Fund has separate Portfolios that correspond to the sub-accounts of the Separate Account. Assets of each such sub-account are invested in shares of the corresponding Fund Portfolio.

A Portfolio of the Fund might make a material change in its investment policy. If that occurs, you will be notified of the change. In addition, no change will be made in the investment policy of any of the sub-accounts of the Separate Account without approval of the appropriate insurance supervisory official of our domiciliary state of New York. The approval process is on file with the insurance supervisory official of the state where the policy is delivered. If, in our judgment, a Portfolio of the Fund becomes unsuitable for investment by a sub-account of the Separate Account for any reason, we may substitute shares of another Portfolio of the Fund or shares of another mutual fund. Any such change will be subject to approval by the Securities and Exchange Commission and, where required, by the insurance supervisory official of the state where this policy is delivered.

**Voting Rights**

Although we are the legal owner of the Fund shares, we will vote the shares at regular and special meetings of the shareholders of the Fund in accordance with instructions received from you and the other owners of the policies. Any shares held by us will be voted in the same proportion as voted by you and the other owners of policies. However, we reserve the right to vote the shares of the Fund without direction from you if there is a change in the law which would permit this to be done.

**Share of Separate Account Sub-account Values**

The share of this policy in the value of each sub-account of the Separate Account on a valuation date is the unit value of that sub-account on that date multiplied by the number of this policy's units in that sub-account after all transactions for the valuation period ending on that day have been processed. For any day which does not fall on a valuation date, the share of this policy in the value of each sub-account of the Separate Account is determined using the number of units on that day after all transactions for that day have been processed and the unit values on the next valuation date.

**Unit Value**

The unit value of each sub-account of the Separate Account was set by us on the first valuation date of each such sub-account. The unit value of a sub-account of the Separate Account on any other valuation date is determined by multiplying the unit value of that sub-account on the just prior valuation date by the Net Investment Factor for that sub-account for the then current valuation period. The unit value of each sub-account of the Separate Account on a day other than a valuation date is the unit value on the next valuation date.

Unit values are carried to 6 decimal places. The unit value of each sub-account of the Separate Account on a valuation date is determined at the end of that day.

**Net Investment Factor**

The Net Investment Factor for each sub-account of the Separate Account is determined by the investment performance of the assets held by the sub-account during the valuation period. Each valuation will follow applicable law and accepted procedures. The Net Investment Factor is equal to item (D) below subtracted from the result of dividing the sum of items (A) and (B) by item (C) as defined below.

(A) The value of the assets in the sub-account on the current valuation date, including accrued net investment income and realized and unrealized capital gains and losses, but excluding the net value of any transactions during the current valuation period.

(B) The amount of any dividend (or, if applicable, any capital gain distribution) received by the sub-account if the "ex-dividend" date for shares of the Fund occurs during the current valuation period.

(C) The value of the assets in the sub-account as of the just prior valuation date, including accrued net investment income and realized and unrealized capital gains and losses, and including the net value of all transactions during the valuation period ending on that date.

(D) The sum of the following daily charges as shown on the Schedule Page, multiplied by the number of days in the current valuation period:

(1) the mortality and expense risk charge; and

(2) the charge, if any, for taxes and reserves for taxes on investment income, and realized and unrealized capital gains.

## PART 6:  LIFETIME BENEFITS

**Transfers**

You may transfer all or a portion of this policy's value among one or more of the sub-accounts of the Separate Account and the unloaned portion of the Guaranteed Interest Account. We reserve the right to limit the number of transfers you may make, however, you can make up to six transfers per contract year from sub-accounts of the Separate Account and only one transfer per contract year from the unloaned portion of the Guaranteed Interest Account unless the Systematic Transfer Program is elected. Under that program, funds may be transferred automatically among the sub-accounts on a monthly, quarterly, semi-annual or annual basis. Unless we agree otherwise, the minimum initial and subsequent transfer amounts are $25 monthly, $75 quarterly, $150 semi-annually or $300 annually. Except as otherwise provided under the Systematic Transfer Program, the amount that may be transferred from the Guaranteed Interest Account at any one time cannot exceed the higher of $1,000 or 25% of the value  of the Guaranteed Interest Account.

Transfers may be made by written or telephone request. The maximum transfer charge is shown on the Schedule Page. There is no transfer charge for the Systematic Transfer Program. Any such charge will be deducted from the sub-accounts from which the amounts are to be transferred in the same proportion as the amounts to be transferred bear to the total amount transferred. The value of each sub-account will be determined on the Valuation Date that coincides with the date of transfer.

**Loans**

While this policy is in force, a loan may be obtained against this policy in any amount up to the available loan value. To obtain a loan, this policy must be properly assigned to us as security. We need no other collateral.

The loan value is 90% of the result of subtracting the then applicable surrender charge from the then policy value. The "available loan value" is the loan value on the current day less any outstanding debt.

The amount of the loan will be added to the loaned portion of the Guaranteed Interest Account and subtracted from this policy's share of the sub-accounts based on the allocation you request at the time of the loan. The total reduction will equal the amount added to the loaned portion of the Guaranteed Interest Account. Unless we agree otherwise, allocations to each sub-account must be expressed in whole percentages. If no allocation request is made, the amount subtracted from the share of each sub-account will be determined in the same manner as provided for monthly deductions.

Debt may be repaid at any time during the lifetime of the insured while this policy is in force. Such repayment, in excess of any outstanding accrued loan interest, will be applied to reduce the loaned portion of the Guaranteed Interest Account and will be transferred to the unloaned portion of the Guaranteed Interest Account to the extent that loaned amounts taken from such account have not previously been repaid. Otherwise, such balance will be transferred among the sub-accounts you request upon repayment and, if no allocation request is made, we will use your most recent premium allocation schedule on file with us. Any debt repayment received by us during a grace period as described in Part 4 will be reduced to cover any overdue monthly deductions and only the balance applied to reduce the debt. Such balance will also be applied as described to reduce the loaned portion of the Guaranteed Interest Account.

While there is any outstanding debt against this policy, any payments received by us for this policy will be applied directly to reduce the debt unless specified as a premium payment. Until the debt is fully repaid, additional debt repayments may be made at any time during the lifetime of the insured while this policy is in force.

Failure to repay a policy loan or to pay loan interest will not terminate this policy except as otherwise provided under Grace Period  and

Lapse in Part 4 when the policy does not have sufficient remaining value to pay the monthly deductions, in which event, that grace period provision will apply.

**Loan Interest**

Loans will bear interest at an effective annual rate equal to the loan interest rate shown on the Schedule Page and will be compounded daily. Interest will accrue on a daily basis from the date of the loan and is included as part of the debt under this policy. Loan interest will be due on each policy anniversary. If not paid when due, the outstanding accrued interest on that date will be charged as a loan against this policy.

**Cash Surrender Value**

The cash surrender value of this policy is the policy value as defined in Part 4 less any applicable surrender charge on the date of surrender and less any debt. The surrender charge for a full surrender is as stated on the Schedule Pages, or Revised Schedule Pages if there has been an increase in face amount.

**Full Surrender**

You may fully surrender this policy for its cash surrender value by returning this policy to us at our VUL along with a written release and surrender of all claims under this policy signed by you and any assigns. You may do this at any time during the lifetime of the insured while this policy is in force. The written surrender must be in a form satisfactory to us and must include such tax withholding information as we may reasonably require. The surrender will be effective on the "date of surrender" which is the later of the dates on which we receive the returned policy and the written surrender. Upon full surrender all insurance and any rider benefits provided under this policy will terminate. You may direct that we apply the surrender proceeds under any of the Payment Options described in Part 8.

**Partial Surrender**

You may obtain a partial surrender of this policy by requesting that a part of this policy's cash surrender value be paid to you. You may do this at any time during the lifetime of the insured while this policy is in force with a written request signed by you and any assigns. We reserve the right to require that this policy first be returned to us before payment is made. A partial surrender will be effective on the date we receive the written request or, if required, the date we receive this policy if later. You may direct that we apply the surrender proceeds under any of the Payment Options described in Part 8.

A partial surrender will be denied if the resultant cash surrender value would be less than or equal to zero. We reserve the right not to allow partial surrenders if the resulting death benefit would be less than $25,000 or if the amount of the partial surrender is less than $500. We further reserve the right to require that the entire balance of a sub-account be surrendered and withdrawn if the share of this policy in the value of that sub-account would, immediately after a partial surrender, be less than $500.

Upon a partial surrender, the policy value will be reduced by the sum of the following:

(A) The partial surrender amount paid. This amount comes from a reduction in this policy's share in the value of each sub-account based on the allocation you request at the time of the partial

surrender. If no allocation request is made, the assessment to each sub-account will be made in the same manner as provided for monthly deductions.

(B) The partial surrender fee. The fee is the lesser of $25 and 2% of the partial surrender amount paid. The assessment to each sub-account will be made in the same manner as provided for the partial surrender amount paid.

(C) A partial surrender charge. This charge is equal to a pro-rata portion of the applicable surrender charge that would apply to a full surrender, determined by multiplying such applicable surrender charge by a fraction equal to the partial surrender amount payable divided by the result of subtracting the applicable surrender charge from the policy value. This amount is assessed against the sub-accounts in the same manner as provided for the partial surrender amount paid.

The cash surrender value will be reduced by the partial surrender amount paid plus the partial surrender fee. The face amount of this policy will be reduced by the same amount as the policy value is reduced as described above. We will send you a Revised Schedule Page reflecting this change.

**Additional Insurance Option**

While this policy is in force and subject to the terms of this provision, including our receipt of evidence satisfactory to us of the insured's then insurability, you have the option to purchase additional insurance on the same insured under the same plan of insurance as this policy without our assessment of any issue expense charge under the new policy. Except for our waiver of the issue expense charge, the new policy will be based on the same guaranteed rates and charges as are in effect for this plan on the Policy Date of this policy as adjusted for the insured's new attained age and change, if any, in risk classification. The new policy will only include such rider benefits as we may agree based on our rules and practices in effect on the Policy Date of the new policy. The amount of insurance under the new policy, when added to all other insurance with our company on the life of the insured, cannot exceed our total insurance amount limitations in effect on the Policy Date of the new policy.

To elect this option, you must file a written application with our VUL. It must be signed by you and the insured. We must also receive:

(A) Evidence that you have a satisfactory insurable interest in the life of the insured.

(B) Evidence, satisfactory to us, that the insured is then insurable under our established practice in the selection of risks for this plan of insurance, including the new amount applied for and rider benefits requested. Selection of risks includes health and non-health factors.

(C) Payment, while the insured is alive, of the full issue premium for the new policy. The payment must equal or exceed our minimum issue premium requirements in effect for this plan on the Policy Date of the new policy.

Any exclusions applicable to the new policy will be determined in accordance with our rules and practices in effect on the Policy Date of the new policy. The new policy will not be subject to any assignments or liens against this policy. The owner and the beneficiary under the new policy shall be as requested in the application for the new policy. Any subsequent changes will be governed by the printed provisions of the new policy.

The new policy will begin in effect as of the later of:

a.  our approval of the application for the new policy;

b.  payment of the full issue premium due on the new policy.

The Policy Date of the new policy will be as shown on the schedule pages of the new policy based on our rules and practices then in effect. The time periods for the suicide and contestability provisions in the new policy will be measured from the Policy Date of the new policy.

## PART 7:  DEATH BENEFITS

While the policy is in force, you have the right to elect either of the two death benefit options as described below. The death benefit option shall be as elected in the original application unless later changed as provided below. If no option is elected, Death Benefit Option 1 shall apply.

**Death Benefit Option 1**

Under this option, during all policy years until the policy anniversary which follows the insured's 100th birthday, the death benefit is equal to the greater of (a) and (b) as defined below:

a.  the policy's face amount on the date of death.

b.  the minimum death benefit on the date of death as defined below.

**Death Benefit Option 2**

Under this option, during all policy years until the policy anniversary which follows the insured's 100th birthday, the death benefit is equal to the greater of (a) and (b) as defined below:

a.  the policy's face amount on the date of death plus the policy value.

b.  the minimum death benefit on the date of death as defined below.

**Minimum Death Benefit**

The minimum death benefit is the policy value on the date of death of the insured increased by the applicable percentage from the table below, based on the insured's attained age at the beginning of the policy year in which the death occurs.

| Attained Age | Pct | Attained Age | Pct | Attained Age | Pct | Attained Age | Pct |
|---|---|---|---|---|---|---|---|
| Under 40 | 150% | 53 | 64% | 67 | 18% | 81 | 5% |
| 40 | 150 | 54 | 57 | 68 | 17 | 82 | 5 |
| 41 | 143 | 55 | 50 | 69 | 16 | 83 | 5 |
| 42 | 136 | 56 | 46 | 70 | 15 | 84 | 5 |
| 43 | 129 | 57 | 42 | 71 | 13 | 85 | 5 |
| 44 | 122 | 58 | 38 | 72 | 11 | 86 | 5 |
| 45 | 115 | 59 | 34 | 73 | 9 | 87 | 5 |
| 46 | 109 | 60 | 30 | 74 | 7 | 88 | 5 |
| 47 | 103 | 61 | 28 | 75 | 5 | 89 | 5 |
| 48 | 97 | 62 | 26 | 76 | 5 | 90 | 5 |
| 49 | 91 | 63 | 24 | 77 | 5 | 91 | 4 |
| 50 | 85 | 64 | 22 | 78 | 5 | 92 | 3 |
| 51 | 78 | 65 | 20 | 79 | 5 | 93 | 2 |
| 52 | 71 | 66 | 19 | 80 | 5 | 94 | 1 |
| | | | | | | 95 | 0 |
| | | | | Over 95 | 0 | | |

**Death Benefit Following Insured's Age 100**

After the policy anniversary which follows the insured's 100th birthday, the death benefit will equal the policy value.

**How to Change the Death Benefit Option**

While this policy is in force, you may request in writing that the Death Benefit Option be changed from Option 1 to Option 2, or from Option 2 to Option 1. No evidence of insurability is required. If the request is to change from Option 1 to Option 2, the face amount will be decreased by the policy value and if the request is to change from Option 2 to Option 1, the face amount will be increased by the policy value. Any such change will be in effect on the Monthly Calculation Day coincident with or next following the day we approve the request.

**Request for an Increase in Face Amount**

Anytime that this policy is in force, you may request an increase in its face amount. Unless we agree otherwise, the minimum such face amount increase is $25,000, and the increase will be effective on the first policy anniversary on or following the date that we approve the request. Such date will be shown as the issue date for such increase on the Revised Schedule Pages we send you reflecting the change. All requests to increase the face amount must be applied for on a supplemental application and will be subject to evidence of the insured's insurability satisfactory to us. The insured must be alive on the issue date, and you must also pay to us in advance such issue premium for the increase as we may require according to our published rules then in effect. If no issue premium is required, the increase will not take effect unless the cash surrender value on the issue date at least equals the monthly deduction for the total combined face amount. The Issue Expense Charge for Face Amount increases is as stated on the Schedule Page.

We will send you Revised Schedule Pages reflecting the change. We reserve the right to further require that the policy be returned to us so that we may incorporate the change.

**Right to Cancel Face Amount Increases**

You have the right to cancel any increase in the face amount provided by us under this policy pursuant to your request, within a limited time as stated below. The increase in face amount may be cancelled by returning the policy to us at the following address:

Phoenix Variable Products Mail Operation
P.O. Box 8027
Boston, MA   02266–8027

To cancel, you must return the policy, including the Revised Schedule Pages, before the latest of:

1. 10 days after the new Revised Schedule Page showing such increase in the face amount is delivered to you; or

2. 10 days after a Notice of Right to Cancel is delivered to you; or

3. 45 days after Part 1 of the supplementary application for such increased face amount is signed.

Upon any such cancellation we will refund the higher of any paid premium required by us for the increase or the sum of any monthly deductions and any other fees and charges made under this policy for the increase in face amount.

**Request for a Decrease in Face Amount**

You may request a decrease in face amount at any time after the first policy year. Unless we agree otherwise, the decrease requested must at least equal $10,000 and the face amount remaining after the decrease must at least equal $25,000. All requests to decrease the face amount must be in writing and will be effective on the first Monthly Calculation Day following the date we approve the request. We reserve the right to require that this policy first be returned to us before the decrease is made. Upon a decrease in face amount, a partial surrender charge will be deducted from the policy value based on the amount of the decrease. The charge will equal the applicable surrender charge that would then apply to a full surrender multiplied by the result of dividing the decrease in face amount by the face amount of the policy before the decrease. We will send you a Revised Schedule Page reflecting the change.

**Death Proceeds**

Upon receipt of due proof at our VUL that the insured died while this policy is in force, we will pay the death proceeds of this policy. The death proceeds equal the death benefit on the date of death, with the following adjustments;

(A) We will deduct any debt outstanding against this policy.

(B) We will deduct any monthly deductions to and including the policy month of death not already made.

(C) We will add any premiums received by us after the Monthly Calculation Day just prior to the date of death and on or before the date of death.

| | |
|---|---|
| **Interest on Death Proceeds** | We will pay interest on any death proceeds from the date of the insured's death to the date of payment. The amount of interest will be the same as would be paid were the death proceeds left for that period of time to earn interest under Payment Option 2. |
| **The Beneficiary** | Unless another payment option is elected as described in Part 8, any death proceeds that become payable will be paid in equal shares to such beneficiaries living at the death of the insured as stated in the application for this policy or as later changed. Payments will be made successively in the following order: |

a. Primary beneficiaries.

b. Contingent beneficiaries, if any, provided beneficiary is living at the death of the insured.

c. You or your executor or administrator, provided no primary or contingent beneficiary is living at the death of the insured.

Unless otherwise stated the relationship of a beneficiary is the relationship to the insured.

| | |
|---|---|
| **How to Change the Beneficiary** | You may change the beneficiary under this policy by written notice signed by you and filed with us at our VUL. When we receive it, the change will relate back and take effect as of the date it was signed. However, the change will be subject to any payments made or actions taken by us before we received the notice at our VUL. |

# PART 8:  PAYMENT OPTIONS

| | |
|---|---|
| **Who May Elect Payment Options** | The proceeds of this policy will be paid in one sum unless otherwise provided. As an alternative to payment in one sum as provided under Option 1, any surrender or death proceeds that become payable under an account may be applied under one or more of the alternative income payment options as described in this part or such other payment options as may then be currently available for the policy. |

Our consent is required for the election of an income payment option by a fiduciary or any entity other than a natural person. Our consent is also required for elections by any assigns or an owner other than the insured if the owner has been changed. You may designate or change one or more beneficiaries who will be the payee or payees under the option elected. You may only do this during the lifetime of the insured. For death proceeds, if no election is in effect when the death benefit becomes payable, the beneficiary may elect a payment option.

Unless we agree otherwise, all payments under any option chosen will be made to the designated payee or to his executor or administrator. We may require proof of age of any payee or payees on whose life payments depend as well as proof of the continued survival of any such payee(s).

**How to Elect a Payment Option**

The election of an income payment option must be in a written form satisfactory to us. We require that at least $1,000 be applied under any income option chosen.

**Payment Options**

This section provides a brief description of the various payment options that are available. In Part 9 you will find tables illustrating the guaranteed installment amount provided by several of the options described in this section. The amount shown for Options 4, 5, and 7 are the minimum monthly payments for each $1,000 applied. The actual payments will be based on the monthly payment rates we are using when the first payment is due. They will not be less than shown in the tables.

Option 1 – Payment in one sum

Option 2 – Left to earn interest

We pay interest during the payee's lifetime on the amount left with us under this option as a principal sum. We guarantee that at least one of the versions of this option will provide interest at a rate of at least 3% per year.

Option 3 – Payments for a specific period

Equal income installments are paid for a specified period of years whether the payee lives or dies. The first payment will be on the date of settlement. The Option 3 Table shows the guaranteed amount of each installment for monthly and annual payment frequencies. The table assumes an interest rate of 3% per year on the unpaid balance. The actual interest rate is guaranteed not to be less than this minimum rate.

Option 4 – Life annuity with specified period certain

Equal installments are paid until the later of:

(A) The death of the payee.

(B) The end of the period certain.

The first payment will be on the date of settlement. The period certain must be chosen at the time this option is elected. The periods certain that may be chosen are as follows:

(A) Ten years

(B) Twenty years

(C) Until the installments paid refund the amount applied under this option. If the payee is not living when the final payment falls due, that payment will be

limited to the amount which needs to be added to the payments already made to equal the amount applied under this option.

If, for the age of the payee, a period certain is chosen that is shorter than another period certain paying the same installment amount, we will deem the longer period certain as having been elected. The life annuity provided under this option is calculated using an interest rate of 3-3/8%, except that any life annuity providing a period certain of twenty years or more is calculated using an interest rate of 3-1/4%.

Option 5 – Life Annuity

Equal installments are paid only during the lifetime of the payee. The first payment will be on the date of settlement. Any life annuity as may be provided under this option is calculated using an interest rate of 3-1/2%.

Option 6 – Payments of specified amount

Equal installments of a specified amount, out of the principal sum and interest on that sum, are paid until the principal sum remaining is less than the amount of the installment. When that happens, the principal sum remaining with accrued interest will be paid as a final payment. The first payment will be on the date of settlement. The payments will include interest on the principal sum remaining at a rate guaranteed to at least equal 3% per year. This interest will be credited at the end of each year. If the amount of interest credited at the end of a year exceeds the income payments made in the last 12 months, that excess will be paid in one sum on the date credited.

Option 7 – Joint survivorship annuity with 10-year period certain

The first payment will be on the date of settlement. Equal income installments are paid until the latest of:

(A) The end of the 10-year period certain.

(B) The death of the insured.

(C) The death of the other named annuitant.

The other annuitant must be named at the time this option is elected and cannot later be changed. That annuitant must have an adjusted age as defined in Part 9 of at least 40. The joint survivorship annuity provided under this option is calculated by using an interest rate of 3-3/8%.

We may offer other payment options or alternative versions of the options listed in the above section.

**Additional Interest**

In addition to:

(A) the interest of 3% per year guaranteed on the principal sum remaining with us under Options 2 or 6; and

(B) the interest of 3% per year included in the installments payable under Option 3.

We will pay or credit at the end of each year such additional interest as we may declare.

## PART 9: TABLES OF PAYMENT OPTION AMOUNTS

The installment amounts shown in the tables that follow are shown for each $1,000 applied. Amounts for payment frequencies, periods or ages not shown will be furnished upon request. Under Options 4 and 5, the installment amount for younger ages than shown will be the same as for the first age shown and for older ages than shown it will be the same amount as for the last age shown.

The term "age" as used in the tables refers to the adjusted age. Under Options 4 and 5, the adjusted age is defined as the age of the payee on the payee's birthday nearest the effective date of the payment option elected.

Under Option 7, the adjusted age is the age on the birthday nearest to the policy anniversary nearest the date of surrender.

### Option 3 - Payments for a specified period

| Number of Years | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 25 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Annual Installments | $211.99 | 179.22 | 155.80 | 138.31 | 124.69 | 113.82 | 104.93 | 97.54 | 91.29 | 85.95 | 81.33 | 77.29 | 73.74 | 70.59 | 67.78 | 65.26 | 55.76 | 49.53 |
| Mo. Installments | $17.91 | 15.14 | 13.16 | 11.68 | 10.53 | 9.61 | 8.86 | 8.24 | 7.71 | 7.26 | 6.87 | 6.53 | 6.23 | 5.96 | 5.73 | 5.51 | 4.71 | |

### *Option 4 - Life annuity with specified period certain

| Age of Payee | Installment Refund | | 10 Yrs Certain | | 20 Yrs. Certain | | Age of Payee | Installment Refund | | 10 Yrs Certain | | 20 Yrs. Certain | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | Male | Female | Male | Female | | Male | Female | Male | Female | Male | Female |
| 10 | $3.08 | $3.03 | $3.08 | $2.99 | $3.00 | $2.94 | 50 | $4.36 | $4.12 | $4.50 | $4.10 | $4.28 | $3.99 |
| 15 | 3.14 | 3.09 | 3.15 | 3.04 | 3.07 | 3.00 | 55 | 4.76 | 4.47 | 4.95 | 4.47 | 4.61 | 4.31 |
| 20 | 3.22 | 3.16 | 3.24 | 3.11 | 3.15 | 3.07 | 60 | 5.28 | 4.93 | 5.54 | 4.96 | 4.97 | 4.67 |
| 25 | 3.33 | 3.24 | 3.34 | 3.20 | 3.25 | 3.15 | 65 | 5.97 | 5.54 | 6.30 | 5.63 | 5.29 | 5.06 |
| 30 | 3.45 | 3.35 | 3.47 | 3.30 | 3.38 | 3.25 | 70 | 6.91 | 6.39 | 7.24 | 6.50 | 5.43 | 5.31 |
| 35 | 3.61 | 3.48 | 3.64 | 3.43 | 3.55 | 3.38 | 75 | 8.21 | 7.57 | 8.26 | 7.56 | 5.44 | 5.40 |
| 40 | 3.80 | 3.64 | 3.86 | 3.60 | 3.74 | 3.54 | 80 | 10.04 | 9.26 | 9.12 | 8.60 | 5.46 | 5.46 |
| 45 | 4.05 | 3.85 | 4.14 | 3.82 | 3.99 | 3.74 | 85 | 12.61 | 11.68 | 9.60 | 9.31 | 5.46 | 5.46 |

## Option 5 - Life annuity

| Age of Payee | Male | Female | Age of Payee | Male | Female |
|---|---|---|---|---|---|
| 10 | 3.17 | 3.12 | 50 | 4.62 | 4.28 |
| 15 | 3.24 | 3.18 | 55 | 5.12 | 4.68 |
| 20 | 3.32 | 3.25 | 60 | 5.79 | 5.24 |
| 25 | 3.42 | 3.34 | 65 | 6.75 | 6.04 |
| 30 | 3.56 | 3.44 | 70 | 8.15 | 7.22 |
| 35 | 3.73 | 3.58 | 75 | 10.26 | 9.03 |
| 40 | 3.95 | 3.75 | 80 | 13.54 | 11.88 |
| 45 | 4.24 | 3.98 | 85 | 18.72 | 16.54 |

## * Option 7 - Joint survivorship annuity with 10-year period certain

| Age of Other Annuitant | Age of Insured Male | | | Age of Other Annuitant | Age of Insured Male | | | Age of Other Annuitant | Age of Insured Female | | | Age of Other Annuitant | Age of Insured Female | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F | 55 | 60 | 65 | F | 55 | 60 | 65 | M | 55 | 60 | 65 | M | 55 | 60 | 65 |
| 40 | 3.62 | 3.64 | 3.65 | 60 | 4.43 | 4.64 | 4.82 | 40 | 3.72 | 3.77 | 3.80 | 60 | 4.34 | 4.64 | 4.93 |
| 45 | 3.80 | 3.83 | 3.86 | 65 | 4.61 | 4.93 | 5.23 | 45 | 3.89 | 3.97 | 4.03 | 65 | 4.44 | 4.82 | 5.23 |
| 50 | 4.00 | 4.07 | 4.12 | 70 | 4.75 | 5.18 | 5.63 | 50 | 4.06 | 4.19 | 4.31 | 70 | 4.50 | 4.95 | 5.48 |
| 55 | 4.22 | 4.34 | 4.44 | 75 | 4.86 | 5.36 | 5.96 | 55 | 4.22 | 4.43 | 4.61 | 75 | 4.54 | 5.03 | 5.65 |

* Minimum monthly income for each $1,000 applied.

# VARIABLE LIFE POLICY EXCHANGE OPTION RIDER

This rider is a part of the policy to which it is attached. Except as stated in this rider, it is subject to all of the provisions contained in the policy.

**Definitions**

The original policy is the policy to which this rider is attached. The cash value of the original policy is defined as the policy's Policy Value less any applicable surrender charge.

A corresponding whole life policy is a policy that we offer as of the Date of Exchange which provides whole life insurance coverage with level premiums and a level face amount, based upon the issue age and risk classification of the insured under the original policy. The cash value of the corresponding whole life policy is defined as the sum of the guaranteed cash value of the base policy and the termination dividend that would then apply to that policy based on our then current dividend scale.

**Policy Exchange Option**

The owner may exchange this policy for a new policy on the life of the insured, without evidence of insurability, if this policy has been in force for at least 15 years and the insured has attained age 65.

**How to Exercise the Option**

To exercise this option, you must file an exchange application at our Main Administrative Office. It must be signed by you. We must also receive:

  a. The release of any lien against or assignment of the original policy. However, you may instead submit written approval by the lienholders or assignees of the exchange of policies in a form satisfactory to us with such other documents as we may require.

  b. The surrender and release of the original policy.

  c. Payment of any amounts due to us for the exchange as described in the Exchange Adjustments section below.

Unless otherwise provided in the exchange application, the owner and the beneficiary of the new policy will be the same as under the original policy. If the owner of the new policy is different, we will require evidence of insurable interest in the life of the insured under that new policy. The application for the original policy shall be considered part of the application for the new policy. The new policy will be issued on the basis of the exchange application, the application for the original policy and any evidence of insurability submitted for issuance of the original policy with respect to the life insured under that new policy.

The Date of Exchange will be the policy anniversary following the later of:

  a. our receipt of the exchange application;

  b. payment of the Exchange Adjustments for the new policy; and

  c. our approval of insurable interest, if applicable.

The new policy will take effect on the Date of Exchange. When the new policy takes effect, the original policy shall terminate.

**The New Policy**

The Policy Date of the new policy will be the same as the Policy Date of the original policy.

The issue age of the insured under the new policy will be as shown on the Schedule Pages of the original policy.

The new policy will be written on any plan of whole life insurance with a level face amount and level premiums that we make available as of the Date of Exchange. The premium classification and any exclusions applicable to the new policy will be determined in accordance with our rules and practices in effect on the original policy's Policy Date.

The face amount of the new policy will be dependent upon the relationship of the cash value of a corresponding whole life policy to the cash value of the original Variable Universal Life policy, as of the Date of Exchange.

A. If the cash value of the corresponding whole life policy, for the same face amount as the original policy, would be greater than or equal to the cash value of the original policy, you may elect the face amount of the new policy from the following options:

1. Same Face Amount – A face amount which is the same as the face amount of the original policy.

2. Same Cash Value – A face amount such that the cash value of the new policy equals the cash value of the original policy as of the Date of Exchange.

3. Same Net Amount at Risk – A face amount such that the excess of the face amount over the corresponding cash value on the new policy is equal to the excess of the death benefit over the cash value of the original policy as of the Date of Exchange.

B. If the cash value of the corresponding whole life policy, for the same face amount as the original policy, is less than the cash value of the original policy, then the face amount of the new policy would be determined based upon the same net amount at risk. Thus, the face amount of the new policy would be such that the excess of the face amount over the cash value of the new policy would be equal to the excess of the death benefit over the cash value of the original policy as of the Date of Exchange.

If, however, you elect to exchange this policy within 30 days of the date for which this option first becomes available to you, then you may exchange to a new policy such that the face amount on the new policy is the same as that of the original policy.

If the death benefit in effect under the original policy as of the Date of Exchange is equal to the "minimum death benefit" as defined in that policy, then the face amount of the new policy may be increased, if so desired, without evidence of insurability, by the lesser of 15% of the face amount of the original policy or $100,000.

Any rider contained in the original policy or additional riders may be included in the new policy only if we consent. The new policy will conform to all of the requirements of the jurisdiction in which it is issued regardless of any terms of this rider providing to the contrary.

The two year period provided for in the Incontestability and Suicide provisions of the new policy will be considered to have begun on the Policy Date of the original policy. However, new benefits not in the original policy, or an increase in benefits would be subject to a new suicide or contestability period.

**Exchange Adjustments**    The exchange is subject to the following adjustments:

1. If the cash value under the new policy is less than that under the original policy as of the Date of Exchange, we will pay you the difference in the cash values.

2. If the cash value under the new policy is greater than that under the original policy as of the Date of Exchange, you must pay us 105% of the excess of the cash value of the new policy over the  cash value of the original policy.

3. The exchange will also be subject to our receipt of repayment of the amount of any policy debt under the original policy on the Date of Exchange.

**Rider Charges**    There are no monthly charges for this rider.

**New Policy Premium**    The rates for the new policy will be based on our published rates in effect on the Date of Exchange for the insured's age and risk classification as of the Policy Date of the original policy. Premiums for the new policy will be first due on the Date of Exchange, and thereafter as specified in the new policy.

**Termination of This Rider**    This rider will terminate on the earlier of:

a. termination of the original policy for any reason, including, but not limited to, lapse, surrender, exchange of the policy, or death of  the insured; and

b. your written request to cancel this rider.

Phoenix Life Insurance Company

*John M. Beers*

Secretary

# POLICY AMENDMENT

This amendment is attached to, and made a part of, the policy as of the policy's Policy Date. There is no cost for this policy amendment.

**Policy Number**     11198960

**Insured**     SCOTT H KORN

The Grace Period and Lapse Provision of Part 4 of the policy is replaced by the following provision:

**Grace Period and Lapse**     If on any Monthly Calculation Day the required monthly deduction exceeds the Policy Value less any Debt during the first eight years or the Cash Surrender Value after the eighth year, a grace period of 61 days will be allowed for the payment of an amount equal to three times the required monthly deduction. The policy will continue In Force during any such grace period. We will mail a Written Notice to You and any assigns at the post office addresses last known to Us as to the amount of premium required. If such premium is not paid to Us by the end of the grace period, this policy will lapse without value, but not before 61 days have elapsed since we mailed Our Written Notice to You. The "date of lapse" will be the Monthly Calculation Day on which the deduction was to be made, and any insurance and rider benefits provided under this policy will terminate as of that date.

Phoenix Life Insurance Company

*John H. Beers*

Secretary

VR32 PA

RVR32PA1

# TEMPORARY MONEY MARKET ALLOCATION AMENDMENT

**This amendment is issued as part of the policy to which it is attached if it is listed on the Schedule Page of the policy or in an endorsement after that page. You should therefore review the policy's Schedule Page for applicability.**

**Refund Right and Temporary Money Market Sub-account Allocation**

The refund right stated in the Right to Cancel provision on the cover page of the policy is amended to provide for a full refund of any premium paid less any unpaid loans and loan interest and less any partial surrender amounts paid, if the returned policy is received by us at our Variable and Universal Life Division prior to termination of the Right to Cancel Period.

**Premium Allocation**

The provision in Part 4, entitled "Premium Allocation to Sub-accounts," is amended to provide that the issue premium will temporarily be applied on its Payment Date entirely to the Money Market sub-account until termination of the Right to Cancel period stated on the cover page of the policy. **Upon termination of such period without prior receipt at our Variable and Universal Life Division of the returned policy for a refund, the then value of this policy's share in the Money Market sub-account will automatically be reallocated based on the premium allocation schedule elected in the application or as later changed by you.** The resultant share of this policy in the value of each of the respective sub-accounts on the date of transfer shall be in the same proportions of the then total policy value as the premium allocation percentages elected in the application or as later changed by you.

**Monthly Deduction**

The provision in Part 4, entitled "Monthly Deduction," is amended to provide that until termination of the Right to Cancel period stated on the cover page of the policy, the monthly deduction will be taken entirely from the Money Market sub-account.

**Transfers**

The provision in Part 6, entitled "Transfers," is amended to provide that no transfers may be made until termination of the Right to Cancel period stated on the cover page.

**Loan Interest**

The provision in Part 6, entitled "Loan Interest" is amended to provide that, until termination of the Right to Cancel period, any debt repayments will temporarily be applied to the Money Market sub-account and reallocated in the same manner as provided above for the issue premium.

Phoenix Life Insurance Company

*John H. Beers*

Secretary

*James D. Wehr*

President and Chief Executive Officer

VR 130

# DISABILITY PAYMENT OF SPECIFIED ANNUAL PREMIUM AMOUNT RIDER

This rider is part of the policy to which it is attached if it and its premium are listed on the Schedule Page of the policy or in an endorsement after that page. You should therefore review the policy's Schedule Page for applicability. Except as otherwise stated below this rider is subject to all of the provisions contained in the policy.

Coverage under this rider will begin in effect on the Rider Date shown for this rider on the policy's Schedule Page provided:

a. for a Rider Date that occurs during the first policy year, the policy value on the Rider Date at least equals the full monthly deduction for the policy (including the rider charge);

b. for a Rider date that occurs during the second policy year and any succeeding policy years, the policy cash surrender value on the Rider Date at least equals the full monthly deduction for the policy (including the rider charge).

**Definition of Total Disability**

Incapacity of the insured as a result of bodily injury or disease to engage for remuneration or profit in any occupation for which the insured is qualified:

a. by training;

b. by education; or

c. by experience.

Total disability is also defined to include the insured's entire and irrecoverable loss through bodily injury or disease of:

a. the sight of both eyes;

b. the use of both hands or both feet; or

c. the use of one hand and one foot.

**Specified Annual Premium Amount Benefits**

The specified annual premium amount as shown with respect to this rider on the policy's Schedule Page is the maximum amount payable under this rider during a policy year. The specified frequency premium amount on any premium due date equals the specified annual premium amount divided by the number of premiums due during a policy year based on the premium frequency in effect for the policy on that premium due date.

Subject to the terms of this rider we will credit the policy with the specified frequency premium amount on each premium due date during the existence of any total disability of at least 6 months' continuous duration, but prior to the later of:

a. the policy anniversary nearest the insured's 65th birthday; or

b. one year from the date the total disability commenced if such total disability commenced within the one-year period prior to the policy anniversary nearest the insured's 65th birthday.

We will continue to credit the specified frequency premium amount as described above on each premium due date on or after the policy anniversary nearest the insured's 65th birthday if benefits under this rider have been credited or paid continuously during the entire 5-year period just prior to that date. In that event any such specified frequency premium amounts will continue to be credited regardless of whether total disability continues after that anniversary.

To the extent that the specified frequency premium amounts to be credited exceed premium amounts allowed to be paid under the policy due to the total premium limit, such excess that would otherwise be credited will be paid in cash to the owner of the policy.

The benefits and values under the policy will not be reduced as a result of any specified frequency premium amounts credited or paid under this rider.

**Limitations and Conditions**

We will not credit or pay any specified frequency premium amounts for premium due dates more than 1 year prior to our receipt of written notice of claim at our Main Administrative Office.

Nor will any specified frequency premium amounts be credited or paid under this rider unless the following conditions are satisfied:

1. We must receive at our Main Administrative Office and during the lifetime of the insured written notice of claim and due proof that:

   a. the insured is totally disabled at the time the proof is furnished to us; and

   b. the insured has been so totally disabled for the entire 6-month period immediately preceding that date.

   Any such proof will be subject to the requirements stated in the Required Proof of Disability section.

2. The total disability must not have directly resulted from either:

   a. injuries willfully and intentionally self-inflicted; or

   b. service by the insured in the military, naval, or air force of any country at war. By "war" we mean any declared war, undeclared war, or international police action with force of arms by any country, the United Nations, or any other assembly of nations.

3. The total disability must have occurred:

   a. after this rider's Rider Date;

   b. after coverage under this rider begins;

   c. before coverage under this rider terminates; and

   d. while the policy is in force.

4. If the total disability occurs during the grace period following the due date of a premium required to keep the policy in force, that premium must first be paid to us. If we permit the premium to be paid after the grace period, the payment must include interest on such amount at a rate of 6% compounded annually.

5. If coverage under this rider terminates or the policy lapses or becomes void by its terms, we must receive written notice of claim no later than 1 year from that date. This condition will not apply if such notice was given as soon as reasonably possible.

**Required Proof of Disability and its Continuance**

In addition to requiring proof of total disability before granting any benefits under this rider, we have the right to require proof from time to time that the total disability continues. As part of any such proof, we shall have the right to have a physician of our choosing conduct such physical exams of the insured as we may reasonably require. After benefits under this rider have been received for a period of disability of more than 2 years, we will not require such exams more frequently than once a year.

Should there be a failure to furnish such proof or a refusal to permit such exams, or should the insured cease to be totally disabled before the policy anniversary nearest the insured's 65th birthday:

a. further specified frequency premium amounts will not be credited or paid; and

b. any specified frequency premium amounts already credited or paid after that date will be charged as loans against the policy unless repaid to us.

**The Payee of any Cash Payments**

If the insured is the owner of the policy and dies before receiving payment of any amount that becomes due, such payment will be made to the same beneficiary and in the same manner as provided under the policy for payment of death benefits. We may also do this if the insured is the owner of the policy and we have evidence satisfactory to us that the insured is mentally incompetent. Upon such payment we shall no longer be liable for payment of such amount.

**Limit on our Right to Contest this Rider**

We cannot contest the validity of this rider except for failure to pay premiums after it has been in force during the lifetime of the insured for 2 years from the Rider Date.

**Monthly Rider Charges**

The monthly charge for coverage under this rider is included in and part of the monthly deduction for the policy. It is deducted on each Monthly Calculation Day until coverage under this rider terminates.

**Termination of Coverage Under this Rider**

Coverage under this rider will terminate on the earliest of:

a. full surrender of the policy;

b. lapse of the policy;

c. death of the insured;

d. the policy anniversary nearest the insured's 65th birthday, unless continued as provided under the Specified Annual Premium Amount Benefits section; or

e. our receipt on any Monthly Calculation Day of your written request, along with the policy, to cancel coverage under this rider.

Phoenix Life Insurance Company

*John H. Beers*

Secretary

# AGE 100⁺ RIDER

This rider is part of the policy to which it is attached. Except as stated in this rider, it is subject to all of the provisions contained in the policy.

**Rider Date of Issue**

The date of this rider is shown on the policy's Schedule Pages.

**Definitions**

**Age 100 Anniversary.** The Policy Anniversary nearest the Insured's 100th birthday.

**Death Benefit After Age 100 Anniversary**

While this rider is in effect, the provision entitled "Death Benefit Following Insured's Age 100" of the policy is replaced by the following:

After the Age 100 Anniversary, the death benefit will equal either (a) or (b), whichever is greater. (a) and (b) are defined below as follows:

a) the policy's Face Amount at the Age 100 Anniversary, plus the Total Rider Insurance Amount of the Policy Term Rider, provided the Policy Term Rider is part of the policy and has not terminated prior to the Age 100 Anniversary.

b) the policy value.

The monthly deduction, as described in the Monthly Deduction provision of the policy, will be zero after the Age 100 Anniversary so long as this rider remains in effect.

**Termination**

This rider will terminate upon:

1. Our receipt of Your Written Request to cancel this rider, which shall be effective as of the next Monthly Calculation Day; or

2. Termination of the policy due to a surrender of the policy for its full Cash Surrender Value, lapse of the policy, or payment of death proceeds of the policy.

Phoenix Life Insurance Company

*John H. Beers*

Secretary

VR39

RVR39ZZ1



**PHOENIX**

Phoenix Life Insurance Company
100 Bright Meadow Boulevard
PO Box 1900
Enfield CT 06083-1900

**Application for Life Insurance**

## Section I - Proposed Insured

| Print Name as it is to appear on policy (First, Middle, Last) | Sex | Birthdate (Month, Day, Year) |
|---|---|---|
| SCOTT H. KORN | ☑ Male  ☐ Female | REDACTED |

| Birthplace (State or Country) | United States Citizen | |
|---|---|---|
| PA | ☑ Yes  ☐ No | |

| Home Telephone Number | Business Telephone Number (Include Extension) | Driver's License Number (Include State) |
|---|---|---|
| ( ) | (610) 940 1080  ext. | see exam |

Home Address (Include Street, Apt. Number, City, State, and ZIP Code)
1233 Meadowbank Road    Villanova, PA  19085
Give Prior Address if at address less than 2 years (Include Street, Apt. Number, City, State, and ZIP Code)

| Current Occupation and Duties | Employer | Length of Employment |
|---|---|---|
| President + CEO | York Paper Co. | 12+ yrs |

Business Address (Include Street, Apt. Number, City, State, and ZIP Code)
901 Industrial Highway    Eddystone, PA   19022

## Section II - Ownership

☐ A. Insured

☐ B. Successive Owners **or** ☐ Owners Jointly

☐ C. Corporation its successors or assigns
    (Include state of incorporation)

☐ D. Partnership (Include Name of all Partners - if partnership is limited, indicate which partners are general partners)

☐ E. Sole Proprietorship (Include Name of Sole Proprietor)

☑ F. Trust (Include Name and Date of Trust, Name of Trustee(s) and of Grantor)

**If Owner is other than Proposed Insured,** give Owner's name, Mailing Address, Relationship to Proposed Insured, and Social Security Number or Tax Identification Number:

Name: _____

Address: _____

Social Security or Tax I.D. Number _____  Relationship: _____  Date of Birth _____

**Contingent Owner**

Name: _____  Date of Birth _____

Relationship: _____

**Ultimate Owner,** Check one. If none checked, insured will be ultimate owner.

☐ Insured  ☐ Executor or administrator of the survivor of the primary and contingent owners

Send premium notices to: (in addition to owner)

☑ Proposed Insured:  ☐ Home Address  ☑ Business Address

☐ Other (Name and Address) _____

Confirm Statements and Proxies (In addition to owner)

☐ Insured  ☐ Other _____

## Section III - Beneficiary for the Proposed Insured

| Primary Beneficiary | Relationship to Proposed Insured | Date of Birth (If Available) | Social Security No. (If known) |
|---|---|---|---|
| | | | |

| Contingent Beneficiary | Relationship to Proposed Insured | Date of Birth (If Available) | Social Security No. (If known) |
|---|---|---|---|
| | | | |

**Trust**

☐ Trust under insured's will

☐ Inter vivos - Provide name of Trustee _____  Date of Trust _____

A beneficiary to qualify for payment must be living: (Check A or B, otherwise A will apply)

☐ A. at the Proposed Insured's death.

☐ B. on the 30th day after the date of the Proposed Insured's death.

## Section IV - Coverage Applied For

Plan of Insurance *PIE*

**For Proposed Insured's Ages 18 Years and Older Only**
☐ Smoker ☐ Nonsmoker ☐ Neversmoke

Basic Policy Amount
$ *10,000,000*

## Section V - Riders and Features for TRADITIONAL PLANS of Insurance

☐ Accidental Death Benefit
☐ Disability Waiver of Premium on Insured
☐ Conditional Exchange
☐ Guaranteed Renewability Rider
☐ Purchase Protector _____ units
☐ Family Protection
☐ Children's Protection
☐ Living Benefit Rider
☐ Other _____

**Additional Death Benefit Riders:**
PITR $ _____
Other Rider Name _____ Amount $ _____

☐ PAPOR (check one)
 ☐ A-Flexible ☐ B-Flexible with Option Term
 Number of years payable _____
Intended premium payments for the first 7 years:
Year 1 _____ Year 5 _____
Year 2 _____ Year 6 _____
Year 3 _____ Year 7 _____
Year 4 _____ **Maximum Amount** $ _____

**Dividend Option**
☐ Optionterm.
☐ Optionterm Death Benefit $ _____
 Premium Paying Coverage ☐ Yes ☐ No **or**
 ____ % of Increase
☐ Accumulate at Interest
☐ Paid-up Additional Insurance (PUA)
☐ One Year Term with Balanced to:
 ☐ Cash ☐ PUA ☐ ACCUM
☐ Reduce Premium
☐ Cash
☐ Other _____

**Automatic Premium Loan, if applicable (If none checked "Yes" will apply.)**
☐ Yes ☐ No

**Policy Loan Interest Rate, if applicable (If none checked, "Variable" will apply.)**
☐ Variable ☐ Fixed

**Total Insurance Face Amount (Total of all shaded areas)**
$ *10,000,000*

## Section VI - Riders and Features for VARIABLE or UNIVERSAL PLANS of Insurance

☒ Disability Payment of a specified Annual Premium Amount.
Annual Amount $ *100,000*
☐ Accidental Death Benefit
☐ Enhanced Flex Edge (Guaranteed Death Benefit)
 ☐ Age 70 ☐ Age 80 ☐ Age 95
☐ Other Insured Person Rider (VistaFlex **only**)
☐ Guaranteed Insurability Option Rider (VistaFlex and UNIVISTA **only**) Amount $ _____

**Death Benefit Option (check one):** If none checked Option 1 will apply.
☐ Option 1 - Level Face Amount
☒ Option 2 - Increasing Face Amount
☐ Living Benefit Rider
☐ Purchase Protector _____ units
☐ Other _____

First Year Anticipated, Billed Premium (Excluding 1035 Exchange, Lump Sum Funds, etc.)
*120,000*

Subsequent Planned Annual Premium
*120,000*

**Sub-Account Allocation Do Not Use Fractional Percentages. (Must total 100%)**
*10* % Growth *Engemann*  *10* % *Total Return Strategic* *Bechurst*  *10* % *SHA Seneca Med Cap Growth*  *10* % Other *Mid VP Value*
*10* % International *Aberdeen*  *10* % Balanced  *5* % Strategic Theme *Seneca*  *10* % Other *Mid Cap Value Seneca*
*10* % Money Market *Technology*  *10* % Multi-Sector  *5* % Other *Janus Growth*  *10* % Other *Seneca Small Cap Value*

**Temporary Money Market Allocation** ☒ Yes ☐ No If yes, I elect to temporarily allocate my premiums to the Money Market sub-account until termination of the Right to Cancel period as stated in the policy. (Yes will apply to all states which require Temporary Money Market.)

**Telephone Transfers/Exchanges**
☒ Yes ☐ No Telephone transfers/and changes in payment allocation are subject to the terms of the prospectus. If you check the "yes" box, telephone orders will be accepted from you and your registered representative and you agree that, because we cannot verify the authenticity of telephone instructions, we will not be liable for any loss caused by our acting on telephone instructions, unless caused by our gross negligence.

## Section VII - Mode of Premium Payment

☐ Annual ☒ PCS (Phoenix Check-O-Matic Service) ☐ Quarterly ☐ Semi-Annual ☐ Monthly (Variable Life Insurance only)
Multiple Billing Option - Give # or Details _____

☐ List Bill ☐ EICS ☐ Salary Allotment ☐ Pension ☐ Money Purchase Pension
☐ Other _____

OL2140PA

4-01

**Section VIII - Existing Life Insurance for the Proposed Insured**

☐ Yes  ☑ No   With this policy, do you plan to replace (in whole or in part, now or in the future) any existing insurance or annuity in force?

☐ Yes  ☑ No   Do you plan to borrow or otherwise use values from an existing insurance policy or annuity to pay any initial or subsequent premium(s) for this policy?

For all Yes answers above, please provide the following information.

| Company | Insured | Year Issued | Policy Number | Amount | Personal / Business | |
|---|---|---|---|---|---|---|
| | | | | $ | ☐ | ☐ |
| | | | | $ | ☐ | ☐ |
| | | | | $ | ☐ | ☐ |

Describe all additional coverage in force for proposed insured. Include individual and group. If none, write none.

| Company | Year Issued | Policy Number | Amount | Personal / Business | |
|---|---|---|---|---|---|
| PHOENIX | 1992<br>1996 | 2577076<br>2702076 | $ 750,000<br>$ 900,000 | ☑ | ☐ |
| EQUITABLE | 1990<br>1992<br>1995 | 40306451<br>42341175<br>950157953 | 125,000<br>200,000<br>500,000 | ☑ | ☐ |
| | | | $ | ☐ | ☐ |

Total Accidental Death Benefit Amount $_____

**Section IX - Additional Information Regarding the Proposed Insured**

| Proposed Insured's Earned Income | Independent Income | Net Worth |
|---|---|---|
| $ 1,500,000 + | UNKNOWN | $ 10,000,000 + |

Yes No

REDACTED
- Have you smoked any cigarettes in the past 12 months?
- Have you used tobacco or nicotine products in any form in the past 12 months?
- Have you used tobacco or nicotine products in any form in the past 15 years?
- Have you ever applied for life, accident, or health insurance and been declined, postponed, or been offered a policy differing in plan, amount or premium rate from that applied for? (If "Yes", give date, company and reason).
- Are you negotiating for other insurance? (If "Yes", name companies and total amount to be placed in force.)
- Do you intend to live or travel outside the United States or Canada? (If "Yes", state where and for how long).
- Have you flown during the past three years as a pilot, student pilot or crew member? (If "Yes", complete Aviation Questionnaire, form FN 7).
- Have you participated in the past 3 years or plan to engage in any hazardous activity such as motor vehicle, motorcycle or motorboat racing, parachute jumping, skin or scuba diving or other underwater activity, hang gliding or other hazardous avocation? (If "Yes", complete Avocation Questionnaire).
- Have you in the past three years been the driver of a motor vehicle involved in an accident, or charged with a moving violation of any motor vehicle law, or had your driver's license suspended or revoked?

Give full details for all "Yes" answers.

#5.  Applying to Transamerica for $ 5 Million Term
     for Key Man Insurance (Total $15M to be placed)

**Section X - Complete for Insured if Temporary Insurance is Requested**

If either of the following questions are answered "Yes" or left blank, no agent or broker is authorized to accept money and a Temporary Insurance Agreement **may not** be issued, and no coverage will take effect.

Have you:

☐ Yes ☐ No  a. Within the past two years been treated for heart disease, stroke, or cancer or had such treatment recommended?

☐ Yes ☐ No  b. Been advised within the past 60 days by a physician or other practitioner to have any diagnostic test or surgery not yet performed?

**For Home Office or Administrative Office Use Only**

Minor Correction. (No change will be made in amount, amount of premium, age at issue, class, plan or benefits unless agreed to in writing.)

SEE EXAM

## Section XI - Medical History Of Proposed Insured (If Proposed Insured Is Less Than Age 15, Questions Are To Be Answered By The Parent)

| Height | Weight | Has Your Weight Decreased By 10 or More Pounds In The Past 2 Years? If "yes," how much? _____ lbs. ☐ Yes ☐ No |
|---|---|---|

Name(s) and Address(es) of Personal Physician(s) or Health Care Facility(s).   ☐ None

Date and Reason for Last Consultation:

Did Your Mother, Father or Any Sibling Die Prior To The Age Of 60?
☐ Yes   ☐ No If "yes", give cause.

| Yes | No | |
|---|---|---|
| | | Have you within the past 10 years been treated for: |
| ☐ | ☐ | 1. Heart disease, abnormal heart rhythm, heart murmur, chest pain, angina, high blood pressure, or other disorder of the heart or blood vessels? |
| ☐ | ☐ | 2. Skin disease, cancer, tumor, anemia or blood or lymph gland disorder? |
| ☐ | ☐ | 3. Epilepsy, fainting spells, stroke, nervous or mental condition, paralysis or any other abnormality of the brain or nervous system? |
| ☐ | ☐ | 4. Colitis or Crohn's disease, ulcer, hepatitis, liver or digestive disorder? |
| ☐ | ☐ | 5. Asthma, shortness of breath, emphysema, or other lung disorder? |
| ☐ | ☐ | 6. Diabetes or elevated blood sugar, bladder, kidney or other urinary disorder? |
| ☐ | ☐ | 7. Arthritis, or any other disorder of the back, spine, neck or joints? |
| | | In the past 5 years, have you: |
| ☐ | ☐ | 8. Had an electrocardiogram, x-ray, or blood, urine or other medical tests? |
| ☐ | ☐ | 9. Been advised to have any diagnostic test, hospitalization or surgery that was not completed? |
| ☐ | ☐ | 10. Other than noted above, have you in the last 5 years seen a doctor, counselor, therapist or had any illness, injury or surgery? |
| ☐ | ☐ | 11. Have you ever been diagnosed or treated by a medical professional for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC)? |
| ☐ | ☐ | 12. Are you currently taking any medication, treatment, therapy or under medical observation? |
| ☐ | ☐ | 13. During the past 10 years, have you used narcotics, amphetamines, cocaine or any prescription drug except in accordance with a physician's instructions? |
| ☐ | ☐ | 14. During the past 10 years, have you been advised or has treatment been recommended to limit or stop your intake of alcohol? |

Give details to any "Yes" answers to questions. Use OL 1590 if additional space is necessary to record all details.

| Question Number | Diagnosis | Date of Each Occurrence / Duration / Current Status | Name and Addresses of Doctors and Medical Facilities |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

$_____ has been paid by _____ S. KORN (TRUST) to the producer named below for proposed insurance applied for in this application. This sum is to be applied in accordance with and subject to the terms of the Temporary Insurance Receipt bearing the same number as this application.

**I understand that i) no statement made to, or information acquired by any producer who takes this application, shall bind Phoenix Life Insurance Company ("Phoenix Life") unless stated in Part I and/or Part II of this application; ii) the producer has no authority to make, modify, alter or discharge any contract hereby applied for and; iii) the insurance applied for shall not take effect until the issuance of a contract and payment of the issue premium due.**

I have reviewed this application, and I hereby verify that all information given here and any in Part II of this application is true and complete to the best of my knowledge and belief, and has been fully and correctly recorded.

Under penalty of perjury, I certify that the number given is my correct social security or taxpayer identification number and that I am not subject to backup withholding (strike this out and initial if not true).

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

The right is reserved to Phoenix Life to call for a medical examination by an appointed medical examiner should further evidence of insurability be deemed necessary. The producer taking this application certifies that he/she has truly and accurately recorded on the application the information supplied by the proposed insured(s).

If I have purchased a Variable Life Policy, I certify that I have received the prospectus for that policy and its underlying funds.

**Do you understand that if you have purchased a Variable Life Policy, the Death Benefit may be variable or fixed under certain conditions and that the Death Benefit and Cash Values under any Variable Policy may increase or decrease in amount or duration based on the investment experience of the underlying sub-accounts?** ☑ Yes ☐ No

**If you are purchasing a Variable Life Policy, do you believe it is suitable to meet your financial objectives?** ☑ Yes ☐ No

**Authorization Request For Interview**
☐ I do ☑ I do not (check one only) require that I be interviewed in connection with any investigative consumer report that may be prepared.

**Authorization To Obtain Insurance (Nonmedical) Information**
I hereby authorize any insurance company to which I have applied for or inquired about insurance coverage or benefits to give to Phoenix Life Insurance Company or its reinsurers any information relating to or obtained in connection with such application or inquiry including the dollar amounts and status of any policies or claims.

**Authorization To Obtain Health Care (Medical) Information**
I hereby authorize any physician, hospital, clinic or other health care provider or any persons who have health care information about me, including insurance companies and MIB, Inc., to give that information to Phoenix Life Insurance Company ("Phoenix Life"). If the record contains information relating to alcohol or drug abuse or mental health care, enough of this information is also to be released to accomplish the purposes for which the information is requested. This information may be used only for the purpose of risk evaluation, the administration of claims and implementation of policy provisions and for insurance statistical studies.

Phoenix Life may then redisclose it to other persons, including MIB, Inc.; legal representatives, medical consultants, reinsurance companies and consumer reporting agencies, only to the extent required to perform their services (MIB information is not disclosed to consumer reporting agencies). They may disclose certain information to a person or organization for use in risk evaluation, administration of claims or implementation of policy provisions. Phoenix Life may also be required to provide certain information to a state insurance or health department. The information may also be redisclosed as otherwise required or permitted by law, but no information will be given, sold or transferred to any other person not mentioned in this authorization.

This authorization or a true photocopy thereof shall continue to be valid for 30 months from the date signed below unless otherwise required by law. It may be revoked in writing to Phoenix Life at any time until the insurance coverage has been placed in force. I may receive a copy of it on request.

I acknowledge that I have received a copy of the Pre-Notification to applicants regarding the Medical Information Bureau, Investigative Consumer Reports and the Underwriting Process.

| Proposed Insured's Signature<br>X | Parent (for minor proposed insured) | |
|---|---|---|
| Owner (if other than proposed insured) | Witness | Date<br>10/15/01 |

Signed At
X          Eddystone, PA

The Producer hereby certifies that the Applicant signed this application in his/her presence; that he/she has truly and accurately recorded on the application the information supplied by the proposed insured(s); and that he/she is qualified and authorized to discuss the contract herein applied for.

Will the applicant utilize values from another insurance policy (through loans, surrenders or otherwise) to pay for the initial or subsequent premium(s) for the policy applied for? ☐ Yes ☑ No

| Producer's Signature<br>X | Date<br>10/15/01 | Producer I.D. Number<br>62601 |
|---|---|---|
| Broker/ Dealer Name and Address<br>W3 GRIFFITH | | Broker/Dealer Number |

OL2140PA                    5 of 5

022706          4-01

**FLEXIBLE PREMIUM VARIABLE UNIVERSAL LIFE INSURANCE POLICY**

THE DEATH BENEFIT AND OTHER VALUES PROVIDED UNDER THIS POLICY ARE BASED ON THE RATES OF INTEREST CREDITED ON ANY AMOUNTS ALLOCATED TO THE GUARANTEED INTEREST ACCOUNT AND THE INVESTMENT EXPERIENCE OF THE SUB-ACCOUNTS WITHIN OUR SEPARATE ACCOUNT TO WHICH YOUR PREMIUMS ARE ALLOCATED. THUS, THE DEATH BENEFIT POLICY VALUE, AND CASH SURRENDER VALUE MAY INCREASE OR DECREASE IN AMOUNT OR DURATION IN ACCORDANCE WITH THE EXPERIENCE OF THE SEPARATE ACCOUNT. SEE PART 7 FOR A DESCRIPTION OF HOW THE DEATH BENEFIT IS DETERMINED.

**Nonparticipating**

V603 PA

V603PAB1